# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | (CHAPTER 11) |
| | § | |
| THINK3 INC. | § | CASE NUMBER 11-11252 |
| | § | |
| DEBTOR. | § | |

**DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING SECURED POSTPETITION FINANCING,
(II) GRANTING SECURITY INTERESTS AND ACCORDING SUPERPRIORITY
ADMINISTRATIVE CLAIM STATUS, (III) AUTHORIZING USE OF
CASH COLLATERAL, AND (IV) SCHEDULING FINAL HEARING**

Think3 Inc. (the "Debtor"), debtor and debtor-in-possession in the above-referenced chapter 11 case, moves this Court pursuant to sections 105(a), 361, 362, 363, 364, 507 and 1146 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 4001, for entry of interim and final orders in substantially the form attached hereto as Exhibit A (I) authorizing the Debtor to obtain post-petition financing and granting security interests as provided herein on a secured and super-priority basis, (II) authorizing the Debtor's use of cash collateral as that term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), (III) providing adequate protection under sections 361 and 363 of the Bankruptcy Code, and (IV) scheduling a final hearing pursuant to Bankruptcy Rule 4001.

## I.  Jurisdiction

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## II. Factual Background

2. On May 18, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (as amended, the "Bankruptcy Code"). The Debtor is a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### A. Background and Corporate Structure of the Debtor

3. The Debtor was incorporated under the laws of the state of Delaware on June 21, 2000. On September 27, 2010, the Debtor was acquired by ESW Capital LLC of Austin, Texas (the "Parent") in a stock-purchase transaction. All of the issued and outstanding common stock of the Debtor is owned by the Parent.

4. Throughout its history, the Debtor, together with its subsidiaries, was a global leader in the computer-aided design ("CAD") and product lifestyle management ("PLM") software market. The Debtor assisted manufacturing companies with styling, engineering, and tooling solutions and customer support services designed to help companies optimize the entire product development process, and to help industrial designers to create better, more innovative products.

5. The Debtor's principal place of business is Austin, Texas. The Debtor also conducts business in Italy through a branch office (the "Italian Branch"). The Italian Branch is a division of the Debtor and is not a separate legal entity. The Debtor has a worldwide presence through six wholly-owned subsidiaries: think3 GmbH (based in Germany) (the "German Subsidiary"), think3 SARL (based in France) (the "French Subsidiary"), think3 K.K. (based in Japan) (the "Japanese Subsidiary"), think3 Designs Private Limited (based in India) (the "Indian Subsidiary"), think3 China WOFE (based in China) (the "Chinese Subsidiary"), and think3 SRL

(based in Italy) (the "Italian Subsidiary"). The Italian Subsidiary was a distributorship that performed sales and marketing functions for the Debtor. An insolvency proceeding has been commenced against the Italian Subsidiary in Italy, as described in more detail below. The Chinese Subsidiary is in the process of dissolving. The Indian Subsidiary has ceased operations. The French and German Subsidiaries have sought insolvency protection in France and Germany, respectively. The Japanese Subsidiary of the Debtor is operating at this time.

**B.     The Debtor's Assets**

6.     The Debtor's principal assets consist of certain intellectual property (the "China IP"). The Debtor believes the China IP has significant value but will require further development, support, and enhancement before it will be fully marketable.

**C.     The Debtor's Liabilities**

7.     The Debtor's principal liabilities consist of (i) tax debt to the Italian government in the amount of approximately $23 million, (ii) intercompany debt to the Italian Subsidiary and other subsidiaries; (iii) debt to Bologna Group, SpA; (iv) trade debt to various vendors and service providers; (v) potential liability to Versata FZ LLC ("Versata") in a lawsuit (described in detail below); (vi) liability to various customers who have previously purchased perpetual licenses of the Debtor's software; and (vii) liability to current and former employees.

**D.     Events Leading up to Chapter 11 Filing**

8.     The Debtor has been in severe financial distress for some time. The worldwide economic downturn caused a decline in the industries of the Debtor's target customers, and the Debtor has been operating at a loss for several years. In late 2010, the Debtor embarked on an out-of-court restructuring plan aimed at generating enough cash to stabilize its operations, begin

paying off liabilities, and create funding for the further development of the China IP. The plan hinged on the sale of the Debtor's intellectual property other than the China IP (the "Global IP").

9. On October 7, 2010, the Debtor entered into that certain Technology License Agreement (the "License Agreement") with Versata.[1] Under the License Agreement, the Debtor granted Versata the exclusive right to use the Global IP in the design, development, manufacture, marketing, distribution, and support of products. In exchange, Versata paid the Debtor $3,000,000. The Debtor engaged an independent third party, accountant Doctor Antonio Bragaglia of Studio Bragaglia, to advise the Debtor regarding the sale of the Global IP. Dr. Bragaglia determined that the criteria for valuation of the Global IP reflected in the License Agreement were appropriate from a technical and professional point of view, and in line with general accepted financial practice in Italy and worldwide. The transaction with Versata provided a much-needed infusion of cash into the Debtor that allowed the Debtor to pay some of its creditors. The License Agreement is governed by Texas choice of law.

10. Also on October 7, 2010, Versata and the Italian Subsidiary entered into that certain Sales Representative Agreement (the "Sales Representative Agreement"). Pursuant to the Sales Representative Agreement, Versata appointed the Italian Subsidiary as its non-exclusive sales representative in Italy to market the products that Versata would create using the Global IP. In consideration for the services it provides under the Sales Representative Agreement, the Italian Subsidiary is entitled to a commission of fifty percent (50%) of order amounts from new customers.

11. As the next stage in its restructuring effort, the Debtor took steps to reduce costs and operate more efficiently and to raise additional working capital. This process was disrupted

---

[1] Versata is registered and domiciled in Dubai, and is a subsidiary of G-Dev Enterprises LLC, a Delaware entity. G-Dev Enterprises LLC's sole member is Joe Liemandt, who is also the sole member of the Parent.

when, on March 14, 2011, several creditors commenced an insolvency proceeding against the Debtor and its Italian Subsidiary in the Court of Bologna, Italy (the "Italian Court"). The Italian insolvency proceeding is case number 69/2011. Despite the fact that the Debtor conducted its operations in Italy solely through the Italian Branch, the Italian Court placed the Debtor into bankruptcy. The Italian Court appointed Doctor Andrea Ferri as trustee (the "Italian Trustee") for the Debtor.

12. The Italian Trustee has seized control of the Debtor's and the Italian Subsidiary's assets and property. Among other things, the Italian Trustee has taken control of the Debtor's bank accounts in both the United States and Italy. He also has custody and control of the Debtor's books and records, and he will not provide the Debtor access to the information therein. Upon information and belief, the Italian Trustee has also instructed the employees of the Debtor and the Italian Subsidiary not to communicate with the Debtor.

13. Following his appointment, the Italian Trustee sought authority to terminate the License Agreement pursuant to section 72 of the Italian Bankruptcy Law (Royal Decree no. 267 of 16 March 1942). On May 2, 2011, the Italian Court authorized the termination. Upon information and belief, the Italian Trustee asserts that as a consequence of the termination of the License Agreement, Versata no longer has the right to use the Global IP.

14. On May 10, 2011, Versata filed an appeal of the Italian Trustee's termination of the License Agreement. Versata asserted that under the U.S. Copyright Act, 17 U.S.C. §§ 101 *et seq.*, the transfer of the Global IP to Versata under the License Agreement was essentially a transfer of ownership that cannot be terminated. Moreover, even if the transaction under the License Agreement is deemed to create a license, Versata asserted that it is entitled to retain its

rights to use the Global IP regardless of the Italian Trustee's purported termination, as provided in section 365(n) of the Bankruptcy Code.

15. The Italian Trustee's actions have created considerable customer confusion and interfered with the Debtor's business. Upon information and belief, the Italian Trustee has directly contacted Versata's customers and directed them to make payments to the Italian Trustee rather than Versata. The Italian Trustee has seized control of the Debtor's website, and has also posted notices alleging that Versata no longer has the right to license or use the Global IP.

16. As a result of the Italian Trustee's interference with Versata's customers under the Debtor's name, Versata has filed a complaint against the Debtor for breach of the License Agreement, tortious interference, and declaratory relief in the United States District Court for the Western District of Texas, Austin Division, in the case styled and numbered *Versata FZ-LLC v. Think3, Inc.*, Civil Action No. 1:11-cv-404.

17. The Debtor has granted approximately fifty (50) other exclusive licenses of its intellectual property to customers in the United States under agreements similar to the License Agreement. The Debtor is concerned that the Italian Trustee will seek to terminate those licenses as well, leading to further customer confusion and mounting claims against the Debtor. The Italian Trustee's actions have already disrupted the Debtor's out-of-court restructuring efforts, and the Debtor believes that continued customer confusion will significantly hinder its chapter 11 reorganization efforts.

18. As a result of the Debtor's inability to access and further develop its assets due to the Italian Trustee, its lack of liquidity, and the threat of a Versata lawsuit, and in order to preserve its customer relationships and restructure its operations to allow it to develop the China IP, the Debtor was forced to file a voluntary chapter 11 bankruptcy petition.

E.  **The DIP Lender's Connection to the Debtor**

19.  The following recitation is made upon information and belief, after due investigation, and is believed to be substantially accurate. The DIP Lender is Gensym Cayman, L.P., a Cayman Islands exempted limited partnership. The DIP Lender is a subsidiary of Trilogy, Inc. Trilogy, Inc. is an affiliate of the Debtor's Parent. The Debtor did not owe any outstanding debt to the DIP Lender prior to the Petition Date.

F.  **The Debtor's Need to Acquire Postpetition Financing**

20.  An immediate need exists for the Debtor to obtain funds and financial accommodations with which to continue its operations, meet its necessary, ordinary course business expenditures, acquire goods and services, administer and preserve the value of its estate, and maintain adequate cash balances customary and necessary for companies of this size in this industry to maintain customer confidence. The ability of the Debtor to finance its operations requires the availability of additional working capital, the absence of which would immediately and irreparably harm the Debtor, its estate, and its creditors. The Debtor needs the working capital to preserve the confidences of vendors, suppliers, and customers and to preserve the going concern value of its business in contemplation of the development of its intellectual property during the bankruptcy.

21.  The Debtor is unable to obtain financing in the form of unsecured credit allowable solely as an administrative expense under Section 503(b)(1) of the Bankruptcy Code or solely in exchange for the grant of a "superpriority" administrative claim status under Section 364(c)(1).

22.  As part of the Debtor's analysis in considering filing for chapter 11 protection, the Debtor determined that it would require approximately $1 million of aggregate postpetition financing to get through the first 90 days of the bankruptcy, which is the anticipated amount of

time that the Debtor would need to begin developing certain of its intellectual property. Given the Debtor's financial condition and capital structure, the Debtor believed that it could not obtain unsecured postpetition financing allowable solely as an administrative expense under Section 503(b)(1) of the Bankruptcy Code or solely in exchange for the grant of a "superpriority" administrative claim status under Section 364(c)(1). In addition, the Debtor believed that it could not obtain postpetition financing secured by a first priority lien on the Debtor's unencumbered assets (if any) or a subordinated lien on the encumbered assets. As discussed above, the Italian Trustee has been exercising control over certain of the Debtor's assets, including the Debtor's website. The uncertainty created by the Italian Trustee's actions has made it impossible for the Debtor to obtain financing from other sources. Therefore, the DIP Lender was the logical and only choice available to the Debtor for obtaining postpetition financing during its chapter 11 case.

23. The DIP Lender has agreed to provide the Debtor with secured, postpetition financing, which will be effectuated through the DIP Credit Documents (as defined below). The Debtor requires postpetition financing in order to pay its professionals and develop its intellectual property, which is vital to preserving the value of the Debtor's estate. These obligations are set forth in the 8-week budget attached to this Motion as <u>Exhibit B</u> (the "<u>Budget</u>"). All obligations in the Budget becoming due before the final hearing on the Motion must be paid to avoid immediate and irreparable harm to the Debtor's estate.

24. The Debtor's decision to obtain the postpetition financing and enter into the DIP Credit Documents is a result of the exercise of sound and reasonable business judgment. The proposed financing is necessary, essential and appropriate for the continued operations of the Debtor's business and preservation of the bankruptcy estate. Given the circumstances of this

case and of the Debtor and DIP Lender, the terms of the DIP Credit Documents and related transactions are fair, reasonable and adequate, and the proposed financing is in the best interest of the Debtor's estate. The terms of the DIP Credit Documents were negotiated at arms' length and in good faith. The Debtor reasonably believes that no alternative financing is available on any other basis in light of the Italian bankruptcy proceeding and the Italian Trustee's efforts to seize global assets of the Debtor and otherwise take control of or interfere with the Debtor's business. Accordingly, the Debtor is authorized to obtain credit under §364(c)(1), (2) and (3) and 364(d) of the Bankruptcy Code.

25. The availability of sufficient working capital through the incurrence of indebtedness for borrowed money and other financial accommodations is vital to the Debtor's ability to preserve and maintain its going concern value. The relief requested in the Motion is necessary, essential, and appropriate for the continued operation of the Debtor's business and the preservation of its bankruptcy estate.

### III. The Proposed DIP Credit Facility[2]

26. The Debtor and the DIP Lender have reached an agreement on the terms and conditions of a postpetition debtor-in-possession financing arrangement (the "DIP Credit Facility"). The terms and conditions of the DIP Credit Facility are embodied in the Debtor-In-Possession Loan and Security Agreement between the Debtor (as borrower) and the DIP Lender (as lender) (the "DIP Credit Agreement" and, together with all documents and instruments related thereto, the "DIP Credit Documents"). A copy of the DIP Credit Agreement is attached hereto as Exhibit C. It is contemplated that the DIP Credit Facility will be extended to the

---

[2] The description of the DIP Credit Facility outlined in the following paragraphs is intended to be a summary only of the material terms and conditions of the DIP Credit Facility. Parties should read the DIP Credit Agreement and related documents carefully in order to get a full understanding of the terms and conditions of the DIP Credit Facility. If there is any inconsistency between the DIP Credit Facility and this Motion, the terms of the DIP Credit Facility shall govern.

Debtor on the satisfaction of a number of conditions precedent outlined in the DIP Credit Agreement, including the entry of this Interim Order by the Bankruptcy Court.

27. The following is a non-exclusive list of the principal terms of the DIP Credit Facility. Parties should refer to the DIP Credit Agreement for a more complete list of the principal terms of the DIP Credit Facility:

    a. <u>Amount of Loan</u>: $1,050,000 ($150,000 interim) (the "DIP Loan").

    b. <u>Term of the DIP Loan</u>: The period from the Closing Date to the earliest to occur of (a) the date of termination in whole of the Commitment[3] pursuant to the DIP Credit Agreement; (b) the date that is 180 days after the Petition Date; (c) the first date on which all consideration to be paid or provided by a purchaser in any sale, transfer or other disposition of all or substantially all of the Borrower's assets pursuant to Section 363 of the Bankruptcy Code has been paid or provided; and (d) the date thirty (30) days after the date of the consummation of a plan of reorganization in the Chapter 11 Case (such earliest date, the "<u>Termination Date</u>").

    c. <u>Interest Rate</u>: Interest on the DIP Loan shall be payable in monthly arrears at a rate of 10%.

    d. <u>Security Interests/Priority</u>: The DIP Credit Facility shall have superpriority administrative expense status, having priority over any and all administrative expenses of the kinds specified in, or arising or ordered under, sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code, except the Carve-Out (as defined below) and (ii) be secured (a) under section 364(c)(2) of the Bankruptcy Code, by a first-priority, valid, binding, enforceable and perfected Lien on any Collateral not subject to a validly perfected lien as of the Petition Date, and (b) under section 364(c)(3) of the Bankruptcy Code, by a junior, valid, binding, enforceable and perfected Lien on all other Collateral, except as otherwise provided in the Interim DIP Order or the Final DIP Order, as applicable, and subject only to the Carve-Out. The Collateral is substantially all assets of the Debtor, including, but not limited to, all Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, General Intangibles, Instruments, Intellectual Property, Inventory, Investment Property, Letter-of-Credit Rights, other Goods, all money, all products and Proceeds of any and all of the foregoing, and all Supporting Obligations of any and all of the foregoing; all copyrights; all patents and patent applications, domestic or foreign; all state (including common law), federal and foreign

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement.

trademarks, service marks and trade names; all intellectual property; and all Equity Interests.[4]

e.  Carve-out: The DIP Lien and the superpriority claims shall be subject to the following fees and expenses in an amount not to exceed $200,000: (i) amounts payable pursuant to 28 U.S.C. § 1930(a); and (ii) professional fees and expenses (other than for fees and expenses of any foreign representative or such representative's counsel).

f.  Right to Foreclose:  Upon the happening of certain events of default Lender is entitled to foreclose its DIP Liens without further action by the Bankruptcy Court upon three (3) Business Days' prior written notice to Borrower, counsel for the Committee and the United States Trustee.

g.  Indemnity: The DIP Credit Agreement provides that the Debtor shall indemnify the Lender and its respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all claims in connection with the transactions contemplated in the DIP Credit Documents.  The indemnity provision does not extend to an Indemnified Person's gross negligence or willful misconduct.[5]

h.  Conditions Precedent:[6]

- Entry of the Interim DIP Order.
- The Chapter 11 Case shall not have been dismissed or converted to a Chapter 7 Case.
- A Chapter 11 trustee or an examiner having enlarged powers relating to the operation of the business of Borrower shall not have been appointed.
- Any non-U.S. insolvency proceeding in respect of the Borrower shall not have been recognized as a foreign main proceeding under Section 1517 of the Bankruptcy Code.
- No Final Order granting a super-priority claim or a Lien *pari passu* or senior to that of Lender shall have been entered, other than in respect of the Carve-Out.
- The Court shall not have granted relief from the automatic stay (or any other injunction having similar effect) so as to allow a third party to proceed against any material property or assets of Borrower.

i.  Events of Default and Remedies:[7]  Usual and customary for facilities of this nature, including the following:

---

[4] A complete description of the Collateral is contained in Section 1 of the DIP Credit Agreement.
[5] The complete indemnity provision is located in Section 2.12 of the DIP Credit Agreement.
[6] A complete list of the conditions precedent for the DIP Credit Facility is contained in Section 3 of the DIP Credit Agreement.

- failure of the Borrower to make any payment of principal of or interest on the Loan or any other amount payable when due according to the terms of the DIP Credit Agreement, and such failure is not cured within five Business Days;

- dismissal of the Chapter 11 Case with respect to the Borrower or conversion of the Chapter 11 Case to a Chapter 7 case without the prior written consent of the Lender;

- appointment of a chapter 11 trustee or examiner with expanded powers or other person with expanded powers in the Chapter 11 Case;

- granting of relief from the automatic stay to allow any creditor to execute upon or enforce a Lien on any Collateral;

- the entry of an order in respect of Borrower recognizing any non-U.S. insolvency proceeding as a foreign main proceeding under Section 1517 of the Bankruptcy Code or otherwise granting practical control of the Borrower to any Person, including any trustee or other individual purporting to act under non-U.S. law, other than the Borrower's officers and directors having authority to act on behalf of the Borrower as of the date of the DIP Credit Agreement; and

- approval of, or there shall arise, any other administrative expense claim (other than those specifically referred to in the definition of "Carve-Out" in Section 1 of the DIP Credit Agreement) having any priority over, or being *pari passu* with, the administrative expense priority of the Obligations in respect of the Chapter 11 Case.

j. <u>Waivers by Borrower</u>. The DIP Credit Agreement contains a provision whereby Borrower waives certain nonbankruptcy law rights, including, but not limited to, all rights to notice and a hearing prior to Lender's taking possession or control of the Collateral and the benefit of all valuation, appraisal, marshaling and exemption laws.[8]

### IV. Relief Requested

28. Debtor seeks, among other things, authority to enter into the DIP Credit Facility. Debtor requests that the Court enter interim and final orders pursuant to Bankruptcy Code sections 105(a), 361, 362, 363, 364, 507 and 1146 (the "<u>Interim Order</u>" and "<u>Final Order</u>," collectively the "<u>Financing Orders</u>"):

---

[7] A complete list of the Events of Default and Remedies is contained in Section 5 of the DIP Credit Agreement.
[8] The complete waiver provision is contained in Section 5.3 of the DIP Credit Agreement.

  a. authorizing the Debtor to (a) obtain postpetition financing from the DIP Lender up to the maximum availability under the DIP Credit Documents in the form of revolving advances pursuant to the DIP Credit Agreement (of which $150,000 shall be available under the Interim Order on an interim basis) and (b) grant the DIP Lender security interests in the DIP Collateral pursuant to 11 U.S.C. §364(c)(2) and (3) and superpriority administrative claims pursuant to 11 U.S.C. §364(c)(1);

  b. authorizing the Debtor's use of the Cash Collateral of the DIP Lender;

  c. modifying the automatic stay, for cause under 11 U.S.C. §362(d)(1), to the extent necessary for the DIP Lender to effectuate the terms of the DIP Credit Documents, and for the DIP Lender to enforce its rights thereunder; and

  d. scheduling a final hearing pursuant to Bankruptcy Rule 4001(c)(2) no earlier than 14 days after service of the Motion, but no later than 30 days after the Petition Date, at which the Debtor will seek entry of a Final Order authorizing and approving the balance of the DIP Credit Facility;

The requested relief is necessary for Debtor to meet its postpetition working capital needs and to preserve the value of its bankruptcy estate for the benefit of creditors.

## V.   Taxes

29. Pursuant to Section 1146(a) of the Bankruptcy Code, the pledging of any collateral, or the delivery of any security interests or other instruments of transfer, the furnishing of any promissory note(s) or other evidence of indebtedness, in furtherance of, or in connection with the DIP Credit Facility or the DIP Credit Documents, including (i) any mortgages, security agreements, collateral assignments, or other similar agreements or (ii) evidence or documents of perfection (including transfers of assets to and by DIP Lender in connection with enforcement of the Financing Orders) should not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax. *See generally In re T.H. Orlando Ltd.*, 391 F.3d 1287 (11th Cir. 2004) (broad interpretation of Section 1146(c) (which is currently Section 1146(a)).

## VI. Law and Argument

### A. The DIP Credit Facility Satisfies the Standards of Bankruptcy Code Section 364

30. The Debtor is unable to procure credit required to fund its postpetition business operations in the form of unsecured credit or unsecured credit with an administrative expense priority under Bankruptcy Code section 503(b)(1). The Debtor, therefore, had no choice but to seek credit on a secured basis.

31. The procurement of postpetition credit by a debtor-in-possession is governed by Bankruptcy Code section 364. In relevant part, that section provides:

> (c) If the [debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or incurring of debt --
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

32. A debtor seeking financing under Bankruptcy Code section 364(c) must make a reasonable effort to seek other sources of unsecured credit available but "is not required to seek credit from every possible source," and is granted considerable deference in acting in accordance with its business judgment. *In re Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34 (S.D.N.Y. 1990). The Debtor does not have any other financing source to fund the amounts needed to sustain the Debtor's business during the chapter 11 case. The DIP Lender provided the Debtor with enough credit availability. Because of its financial condition and the uncertainty created by the Italian bankruptcy proceeding and the Italian Trustee's efforts to seize global assets of the Debtor and otherwise take control of or interfere with the Debtor's business, the Debtor reasonably believes

that it could not have obtained such financing on more favorable terms than those offered by the DIP Lender. Because the Debtor has a need for the financing offered by the DIP Lender to meet its ongoing working capital needs and to preserve and enhance its going concern value, the Debtor has satisfied its burden of showing the unavailability of alternative unsecured financing.

33. Having determined that postpetition financing was available only under Bankruptcy Code section 364(c), the Debtor negotiated the DIP Credit Facility at arms' length and in accordance with its sound business judgment. In negotiating debtor-in-possession financing arrangements, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties." *Ames Dep't Stores*, 115 B.R. at 38. Courts will evaluate the facts and circumstances of a debtor's case, and will accord significant weight to the necessity for obtaining financing so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code. *See, e.g., Snowshoe,* 789 F.2d 1085 (approving postpetition financing necessary to sustain seasonable business); *Ames Dep't Stores*, 115 B.R. at 40 ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."). Courts generally will not override the debtor's prudent and responsible exercise of its business judgment consistent with its fiduciary duties to the bankruptcy estate and its creditors in negotiating an appropriate financing package. *See In re Simasko Prod Co.,* 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (noting that business judgment should be left to the boardroom and not to the bankruptcy courts).

34. The financing contemplated by the DIP Credit Facility benefits the Debtor's bankruptcy estate and its creditors. It is critical to the preservation and enhancement of the

Debtor's business and going concern value. With the credit provided under the DIP Credit Facility, the Debtor will be able to develop and generate revenue from certain of its intellectual property, maintain adequate cash balances, and operate its business in order to preserve the ongoing value of its assets and enterprise for the benefit of all creditors. The availability of credit under the DIP Credit Facility will provide the Debtor's vendors and suppliers the necessary confidence to continue or resume ongoing relationships with the Debtor, including the extension of credit terms for the payment of services. Accordingly, this Court should authorize the Debtor to obtain postpetition financing to the extent and pursuant to the terms contained in the DIP Credit Documents and the proposed final financing order.

35. The terms and conditions of the DIP Credit Facility and related DIP Credit Documents are fair and reasonable and were negotiated by the parties in good faith and at arm's length. Accordingly, the DIP Lender should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of the Postpetition Financing.

**B.     The Court May Permit The Debtor To Use Its Postpetition Cash Collateral**

36. The Debtor's use of property of its estate is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section…1108…of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

37. A debtor in possession has all the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. *See* 11 U.S.C. § 1107(a).

38. Section 363(c)(2) of the Bankruptcy Code establishes a special requirement with respect to "cash collateral," by providing that the trustee or debtor in possession may not use, sell or lease "cash collateral" under subsection (c)(1) unless:

    a. each entity that has an interest in such cash collateral consents; or

    b. the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

"Cash collateral" is defined as, "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest . . . ." 11 U.S.C. § 363(a).

39. Here, the DIP Lender will have a postpetition lien on the Debtor's cash collateral. The DIP Lender has consented to the Debtor's use of cash collateral in accordance with the terms of the DIP Credit Documents, subject to the terms and conditions set forth in this Motion. Therefore, such use is authorized under Section 363(c)(2).

### VII. Conclusion

40. Based on the foregoing, the Court should enter the Financing Orders (a) granting the Debtor the authority to enter into the DIP Credit Facility and grant security interests thereunder and approving all of the terms and conditions of the DIP Credit Facility and DIP Credit Documents, (b) authorizing the Debtor's use of Cash Collateral, (c) modifying the automatic stay, (d) scheduling a final hearing, and (e) granting the Debtor such other legal and equitable relief to which it is entitled.

Dated:  May 18, 2011  Respectfully submitted,

**HAYNES AND BOONE, LLP**

_/s/ Charles A. Beckham, Jr._
Charles A. Beckham, Jr.
Texas Bar No. 02016600
Brooks Hamilton
Texas Bar No. 24046015
Kelli M. Stephenson
Texas Bar No. 24070678
1 Houston Center
1221 McKinney, Suite 2100
Houston, Texas  77010
Telephone (713) 547-2000
Facsimile (713) 547-2600

**PROPOSED COUNSEL TO DEBTOR-IN-POSSESSION**

## CERTIFICATE OF SERVICE

   I hereby certify that a copy of the foregoing pleading will be served on the parties listed on the proposed Master Service List filed contemporaneously herewith, and in the manner specified by the Debtor's Certificate of Service Concerning First Day Pleadings contemporaneously with service of Debtor's other First Day Pleadings filed in this case.

              /s/ Brooks Hamilton
              Brooks Hamilton

## CERTIFICATE OF TRANSMITTAL TO UNITED STATES TRUSTEE

   Pursuant to Bankruptcy Rule 9034, I hereby certify that a copy of the foregoing pleading will be transmitted to the United States Trustee in the manner specified by the Debtor's Certificate of Service Concerning First Day Pleadings filed in this case.

              /s/ Brooks Hamilton
              Brooks Hamilton