UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | (CHAPTER 11) |
| | § | |
| THINK3 INC. | § | CASE NUMBER |
| | § | |
| DEBTOR. | § | |

**AFFIDAVIT AND STATEMENT OF KUMAR VIKAS
IN SUPPORT OF VERSATA FZ-LLC'S JOINDER IN SUPPORT OF
DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

My name is Kumar Vikas. I am over the age of eighteen and am fully competent to testify.

As the Chief Executive Officer of Versata FZ-LLC, I hereby declare that the following is true to the

best of my knowledge, information, and belief:

1.        I am the Chief Executive Officer ("CEO") of Versata FZ-LLC ("Versata"), a

company organized and existing under the laws of the Dubai Technology and Media Free Zone,

with its principal place of business located at 707-708 Al Thurayal, Dubai Media City, Dubai,

United Arab Emirates. I have held this position since the company's inception.

2.        In my role as CEO I have responsibility for oversight of Versata's operations

internationally, including the Think3 products as well as the other Versata business lines.

3.        The facts in this affidavit are based on my personal knowledge, the documents

maintained in Versata's files relating to this matter, and my discussions with Versata's employees,

customers, partners, and original equipment manufacturers ("OEMs").

**ITALIAN BANKRUPTCY OF THINK3 AND ACTIONS OF ITALIAN TRUSTEE**

4.        As set forth in more detail in the Italian Dispute Action (defined below), the Italian

branch of Think3 Inc. ("Think3") was forced into bankruptcy on or around April 14, 2011, upon the

authorization of the Appointed Judge of the Court of Bologna, Italy (the "Italian Court"). Shortly

after the bankruptcy filing, the Italian Court appointed Dr. Andrea Ferri, an accountant, to manage

Think3, as the trustee in the Italian Bankruptcy Case (the "Italian Trustee").

5.        As a consequence of various disputed actions of the Italian Trustee, some discussed

herein, Versata filed Civil Action No. 1:11-cv-404 in the U.S. District Court for the Western

District of Texas-Austin Division, entitled <u>Versata FZ-LLC v. Think3, Inc.</u>, against the Debtor on May 16, 2011, shortly before the Debtor's Chapter 11 filing (the "<u>Italian Dispute Action</u>"). A copy of the complaint commencing the Italian Dispute Action is attached as Exhibit A hereto.

6.     As another consequence of the disputed actions of the Italian Trustee, the Debtor filed this Chapter 11 case in this Court, in an apparent effort to salvage value for all of its global creditors through a plan of reorganization. That solution is perceived by Versata, as a creditor of the Debtor, to be superior to any solution fashioned by the Italian Trustee whose sole focus, as evidenced by his actions, is protecting and providing for Italian creditors.

7.     Following his appointment, the Italian Trustee has swiftly taken several steps that have directly interfered with and undermined Versata's relationships with its own customers, partners, and OEMs, as well as Versata's intellectual property, contracts, and other assets. Specifically, through conversations with numerous Versata customers and partners over the past two weeks, I have learned that:

i.     The Italian Trustee[1] has contacted nearly all partners and OEMs of both the Debtor and Versata, and has strongly discouraged them and, according to some, even "forbid" them, from doing or continuing to do business with Versata or anyone other than the Italian Trustee;

ii.    The Italian Trustee has told Versata's customers and partners—both over the phone and in writing—that Versata has no right to sell Versata's Think3 Products[2] and that the laws of Italy prohibit Versata from doing so;

_____

[1] In each case where reference is made to the Italian Trustee, the term Italian Trustee shall be understood to mean the Italian Trustee and/or his agents or employees, where appropriate. Also, the Italian Trustee purports to act through a recreated version of Think3 that he controls in Italy and whose actions are the responsibility of the Italian Trustee.

[2] As described in the Italian Dispute Action, Versata acquired certain software, copyrights and other intellectual property from the Debtor in consideration for a $3 million purchase price in a Texas transaction governed by applicable Texas laws. Following that transaction, Versata created new and derivative intellectual property and products that use the trademark Think3 name, but which are owned solely by Versata and as to which the Italian Trustee has no right or interest. Those Versata products, referred to herein as the "Think3 Products," are what Versata customers

<span style="float:right">(Footnote continues on following page.)</span>

iii.    The Italian Trustee has created and authorized the use of public relations materials by his partners and agents, designed to inform customers that they cannot contract with Versata;

iv.    The Italian Trustee has contacted Versata's customers, purporting to be the ONLY authorized seller of Think3 Products;[3] and

v.    The Italian Trustee has posted messages on the Debtor's think3.com website, posted messages on blogs, and emailed communications to customers, OEMs and partners, reiterating these messages; indeed, for Versata's largest customers, the Italian Trustee has contacted them repeatedly in efforts to cut off any relationships between Versata and its most significant customers.

## IMPACT OF ITALIAN BANKRUPTCY ON VERSATA'S CUSTOMERS

8.    The disruption created by the Italian Trustee's aggressive tactics has caused understandable confusion for Versata's customers, partners, and OEMs—and direct and adverse financial consequences on Versata. As a result of the Italian Trustee's misleading messages, several of Versata's partners have stopped placing orders with Versata and have stopped paying for orders already placed. Some of Versata's customers have even begun to work with the Italian Trustee, placing orders and getting unauthorized licenses from him. In addition, the Italian Trustee's interference has caused the abrupt and indefinite suspension of negotiations regarding a new agreement between Versata and its second largest OEM partner.

9.    The Italian Trustee's actions have created a significant revenue disruption from direct Versata customers as well. Some customers have cancelled their agreements with Versata and are seeking a refund based on the communications received from the Italian Trustee. Other

---

(Footnote continued from previous page)

purchase under direct contracts with Versata. The Italian Trustee can claim no right or interest in those Think3 Products or Versata's contracts with its customers relating thereto.

[3] Because the Italian Trustee cannot legally or practically provide customers with such Versata products or services, such customers will be ultimately disappointed when they purchase products or services from the Italian Trustee.

customers are asking for assurances or proof that Versata actually owns the intellectual property purchased from Think3 last year, as described in the Italian Dispute Action. Customers have suspended transactions with Versata which were near-final prior to the Italian Trustee's involvement. The Italian Trustee's messaging and contact has created enormous confusion in the relevant marketplaces throughout the world, and many Versata customers have asked for, at a minimum, legal clarification regarding Versata's rights to the intellectual property. Many others are refusing to move forward and some are buying licenses and maintenance from the Italian Trustee, instead of buying from Versata, and, as a result, are using unauthorized products and are doomed for disappointment when they no longer receive Versata's services, upgrades, and other performance.

10.     Think3, through the Italian Trustee, is effectively driving Versata's customers away by claiming to be the only legal entity authorized to sell Think3 Products, and further, by offering the Products at steeply discounted pricing. In support of his position, the Italian Trustee is sending the legal documents from the Italian Court as "proof" that the Italian Trustee is the only one with the right to sell and support the Think3 Products.

**SPECIFIC VERSATA CUSTOMERS AND PARTNERS IMPACTED BY TRUSTEE**

11.     As discussed above and in the attached complaint, the Italian Trustee has created significant confusion in the marketplace among Versata's customer, which has led to the departure of several Versata customers and partners. Following are a few specific examples showing the severe adverse impact the Italian Trustee's actions are having on Versata.

     i.     OPEN MIND Technologies AG, Versata's largest OEM partner with whom Versata is working toward a new multi-million dollar contract, for the Enterprise software, informed Versata last week they cannot proceed with negotiations until the receive clarification of the legal issue of who owns Versata's Think3 Products and intellectual property.

     ii.    Toyota Caelum Incorporated (also known as "TCI") is Versata's largest value added reseller ("VAR") partner and accounts single-handedly for more than 30% of Versata's revenue. TCI is confused about Versata's position vis a vis the

Italian Trustee has requested clarification. TCI has cancelled an order previously placed with Versata which accounts for nearly 20% of Versata's quarterly revenue.

iii.   <u>Sener</u> is an OEM partner with whom Versata has been negotiating a large volume license agreement for upgrading all customers to the new Enterprise software version. Prior to the Italian Trustee's involvement, Versata and Sener has set the a timeline of completing the deal before June 30, 2011, because Sener must have a license by July in order to avoid disruption to its business. Sener is a global company with operations in Portugal, Spain, the United Kingdom, China, Japan, and Korea. They are the second largest company providing services to ship builders and they have informed Versata that, while they believe us and are excited about doing business with us, they cannot do anything until the legal situation is clarified. They had invited us to their customer conference in Europe on Thursday May 12, 2011, but after being contacted by the Italian Trustee and his agents directly, they said they could not include Versata in the conference as they needed to protect their customers from any legal action.

iv.   <u>First Solutions</u> is a VAR in Italy and they have been told by the Italian Trustee and his agents that they cannot do business with Versata and that they must continue their relationship with the Italian Trustee's version of Think3. First Solutions has stopped paying for the orders they placed with Versata even though they have received the licenses and support from Versata to date. First Solutions has informed Versata that they cannot work with us under threat of law.

v.   <u>Thinkline Solution GmbH</u> ("Thinkline") is a VAR in Germany that has been told by the Italian Trustee that Versata is not authorized to sell or support customers. Since receiving this notification, Thinkline has started to place orders, accept licenses and support from Think3 in Italy.

vi.   <u>Schraml Metallverarbeitung GmbH</u>, a customer through our VAR in Germany, Cinteg AG, requested cancellation of a large order placed to Versata based on the

contact made by the Italian Trustee. Only after several conversations with the Italian Trustee did this customer agree to indefinitely suspend its order and wait until things are more clear.

vii.    BMW is a large customer for which Versata has a relationship to provide custom software, including the development of a specific piece of technology that allows them to save significant amounts of money on manufacturing. BMW has asked for legal clarification before they renew their contracts with Versata. If BMW does not renew soon, its licenses will expire.

viii.   SIGE SPA, another prospective Versata customer, had requested verification of Versata's legal ownership, prior to moving forward with Versata.

ix.     Trafofluid, another customer who recently signed a contract for support and maintenance and new additional licenses, just this week sent a cancellation notice based on communications received from the Italian Trustee.

x.      Studio Genesi, a customer who renewed support and maintenance several months ago, has contacted us to cancel their contract based again on their contact with the Italian Trustee. These customers and partners are just a few of the relationships the Italian Trustee has severely jeopardized for Versata.

**RELEVANCE TO THE DEBTOR OF THE ITALIAN TRUSTEE'S HARM TO VERSATA**

12.     As demonstrated in the attached Italian Dispute Action, the Debtor is contractually obligated to indemnify Versata for all of the harm caused by the Italian Trustee. The longer the Italian Trustee is allowed to proceed with the destructive actions against Versata, the more liability the Debtor will have to Versata.

13.     Moreover, the Italian Trustee's actions directly harm and depress the value of the Debtor's opportunity to market its own products in China—a stated goal and business plan of the Debtor. The customer confusion and related litigation will greatly complicate the Debtor's marketing in China.

14.     As a consequence, all global creditors of the Debtor will be prejudiced by the Italian Trustee's actions. Chapter 11 relief for the Debtor and a constructive plan of reorganization provide the best solution for all creditors and parties in interest.

I declare under penalty of perjury under the laws of the State of Texas and the United States of America that the above is true and correct.

Executed this 19th day of May 2011 at Dubai, United Arab Emirates.

*Kumar Vikas*

KUMAR VIKAS

# EXHIBIT A
# TO AFFIDAVIT OF KUMAR VIKAS

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

Versata FZ-LLC                         §
                                       §
                    Plaintiff,         §
                                       §        CIVIL ACTION NO. 1:11-cv-404
         vs.                           §
                                       §
Think3, Inc.                           §
                                       §
                    Defendant.         §
                                       §
                                       §
_____      §

## PLAINTIFF VERSATA FZ-LLC'S ORIGINAL COMPLAINT

Plaintiff Versata FZ-LLC ("Versata" or "plaintiff"), as its Original Complaint against defendant Think3, Inc. ("Think3" or "defendant"), avers as follows:

## PARTIES

1.       Plaintiff Versata is a company organized and existing under the laws of the Dubai Technology and Media Free Zone, with its principal place of business located at 707-708 Al Thurayal, Dubai Media City, Dubai, United Arab Emirates.

2.       Defendant Think3 is a company organized and existing under the laws of the State of Delaware and has its principal place of business located at 6011 W. Courtyard Dr., Suite 250, Austin, Texas.

3.       An Italian bankruptcy proceeding purporting to affect Think3 (the "Italian Bankruptcy Case") has advanced upon the purported authorization of the Appointed Judge of the Court of Bologna, Italy (the "Italian Court"), dated April 14, 2011.  Purporting to act pursuant to Section 104 of the Italian Bankruptcy Law and other Italian laws and procedures to the extent of competent jurisdiction, if any, Dr. Andrea Ferri purports to manage Think3, as the trustee in the Italian Bankruptcy Case (the "Italian Trustee" or the "Trustee").   Plaintiff is informed and

believes that the Italian Court appointed a creditors committee (the "Italian Creditors Committee") comprised solely of local Italian creditors of the Italian branch of Think3 (the "Italian Branch").  Plaintiff is also informed and believes that the Italian Trustee (and perhaps the Italian Creditors Committee) operates out of the office of the Italian Branch of Think3 at Via Ronzani 7/29, 40033 Casalecchio di Reno, Bologna, Italy, and has converted one or more of the websites maintained there to his own use, including "www.think3.com"  and "care.think3.com" (each a "Website," collectively the "Websites").

## JURISDICTION AND VENUE

4.      This is an action for breach of contract, tortious interference, and declaratory relief.

5.      The amount in controversy, exclusive of interest and costs, is in excess of $75,000. This Court has jurisdiction over the claims under 28 U.S.C. § 1332(a)(2) (Diversity of Citizenship) and 28 U.S.C. §§ 2201-2202 (Declaratory Judgments Act).

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391(a).

## FACTUAL BACKGROUND

7.      Defendant Think3 is engaged in the business of computer software creation, licensing, sales and support, and its products include software used for Computer Aided Design ("CAD") and Product Lifecycle Management ("PLM").  On information and belief, defendant Think3 has one or more "registered branches" in the country of Italy in addition to its facilities and principal place of business in Austin, Texas and its subsidiaries in other countries.

8.      On October 7, 2010, Think3 and Versata entered into a Technology License Agreement (the "Agreement") effective as of that same date.[1]  A true copy of the Agreement is attached hereto as Exhibit A.  Pursuant to the Agreement, Versata has paid to Think3 the sum of $3,000,000 as consideration for the rights and exclusive licenses granted by Think3 to Versata

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

under the Agreement.  This valuation of Think 3's Intellectual Property (as defined in the Agreement), and the methodology used to arrive at that valuation, were determined to be reasonable and correct in the professional opinion of Dr. Antonio Bragaglia, an Italian CPA (Dottore Commercialista) jointly retained by Think3 and Versata.  Under the Agreement, Think3 granted to Versata, among other things, the exclusive right and license to use Think3's Intellectual Property to manufacture, sell, license, distribute, modify, market, support, and commercially exploit all of Think3's CAD and PLM products (collectively, the "Products") that use or incorporate any of Think3's Intellectual Property, and all related maintenance and support contracts and services.  Pursuant to the U.S. Copyright Act, 17 U.S.C. §§ 101, *et seq*., the Agreement constitutes a "transfer of copyright ownership" by "exclusive license" under §§ 101 and 201(d), and the Agreement satisfies all requirements applicable thereto, including pursuant to § 204.  Because the Think3 software is primarily protected by copyright, the transfer of the copyright ownership to Versata in essence transferred the ownership of the CAD and PLM Products to Versata.

9.     Under the Agreement, Think3 also granted to Versata the exclusive right to use Think3's "Marks," including its trademarks, trade names, service marks, logos, and similar designations, and the exclusive right to enforce its intellectual property rights.

10.     Following the execution of the Agreement, in addition to paying Think3 the purchase price of $3,000,000, Versata invested substantial sums in modifying and improving the CAD and PLM Products, supporting preexisting end user licensees of those Products, and entering into new contracts with end users of the Products.  Versata is the owner of the copyrights and other intellectual property rights in all the improvements and modifications it made to the CAD and PLM Products.  As provided under the Agreement, Versata is entitled to receive, and began receiving, licensing and maintenance revenues from end users of the Think3 Products located around the world.

11.     On or after May 2, 2011, Versata was informed that, on or about April 14, 2011, a court in Bologna, Italy had declared Think3 bankrupt, notwithstanding the fact that Think3 is a

Delaware corporation and merely has a registered branch in Italy.  By a letter dated May 2, 2011, received on or after that date, Versata was informed that Dr. Andrea Ferri of Ferri & Associati had been appointed by the Italian Court to be the Italian Trustee and "representative of Think3 Inc., Italian Branch."  In the May 2, 2011 letter, Dr. Ferri asserted that in his capacity as the Italian Trustee and representative of Think3 and on behalf of Think3 that he was terminating, effective immediately, the Agreement between Versata and Think3.  A true copy of the May 2, 2011, letter is attached hereto as Exhibit B.

12.      Dr. Ferri's May 2, 2011 letter asserted to Versata that "any use, disclosure, dissemination or sublicense" of Think3's intellectual property rights as described in the Agreement between Think3 and Versata, as well as the use of any related trademark, "is strictly prohibited and will be prosecuted."  The letter further demanded that Versata immediately cease and desist from displaying the Think3 trademark and immediately delete from its IT systems and deliver to the Italian Trustee all documents and electronic files related in any way to the Think3 intellectual property rights.

13.      In short, the Italian Trustee as the purported representative of Think3 demanded that Versata immediately cease using or distributing the Products and Intellectual Property for which Versata had paid Think3 $3,000,000, and in which Versata invested substantial additional effort and expense to create improvements and modifications to the Products in which Versata indisputably owns the copyrights and other intellectual property rights.  The Italian Trustee further asserted that any ongoing use of the Intellectual Property that Versata had exclusively licensed and paid for was "prohibited" and would be "prosecuted."  In effect, the Italian Trustee is purporting to act as if he has total jurisdiction and control over Think3 and the intellectual property rights of Think3 which have been licensed by and transferred to Versata, and as if the Italian Bankruptcy Case is a sufficient basis to bind all persons throughout the world.

14.      Plaintiff is informed and believes, and on that basis avers, that on or about May 2, 2011, the Italian Trustee took control of the Websites and caused the posting of notices on the Websites stating that as of May 2, 2011, Versata could not license Think3 products or use its

trademarks, and that as of May 4, 2011, Think3 Inc. "restarts its operations" and "will be managed by the trustee, Dr. A. Ferri, and the Creditors' Committee […]."

15.    Plaintiff is informed and believes, and on that basis avers, that at some point on or around May 2, 2011, the Italian Trustee obtained full control of the Website "care.think3.com", which had previously been under the control of Versata.  In addition to controlling the Website, Think3, through the Italian Trustee, obtained access to and control over certain content and tools owned by Versata associated with the "care.think3.com" Website.  Specifically, Think3, at the hands of the Italian Trustee, seized the web-based tools by which Versata generates sublicenses of the Intellectual Property for sale to its customers (the "License Keys"), thereby preventing Versata from generating licenses of the Intellectual Property.

16.    Plaintiff is informed and believes, and on that basis avers, that Think3, acting through the Italian Trustee, has proceeded to use Versata's License Keys to generate unauthorized sublicenses (the "Unauthorized Sublicenses") of the Intellectual Property and/or Products to which Versata has an exclusive license under the Agreement.

17.    Plaintiff is informed and believes, and on that basis avers, that Think3, acting through the Italian Trustee, is selling and/or attempting to sell the Unauthorized Sublicenses at steeply discounted prices (as compared with the price of authorized licenses sold by Versata).[2]

18.    Plaintiff Versata is further informed and believes, and on that basis avers, that Think3, acting through the Italian Trustee Dr. Ferri, has directed end users of Think3 Products who have sublicenses and other contracts obligating them to make payments to Versata instead to submit those payments to the Italian Trustee or his designee, rather than to Versata.

**DECLARATORY JUDGMENT OF VERSATA'S RIGHTS UNDER THE AGREEMENT**

19.    Plaintiff Versata incorporates by reference paragraphs 1 through 18 above.

---

[2] To be clear, Versata maintains that Think3, acting through the Italian Trustee or otherwise, is prohibited from selling and/or attempting to sell the Unauthorized Sublicenses at *any* price.

20.    On or about October 7, 2010, Versata entered into an Agreement with Think3, governed by Texas law, that gave Versata the exclusive right to make, use, sell, modify, sublicense and exploit commercially all of Think 3's Intellectual Property, all Products that use or incorporate that Intellectual Property, and all of Think 3's Marks, as more fully set forth in Exhibit A hereto.

21.    The Agreement further provides in Section 7.3 that Think3 shall "defend, indemnify, and hold [Versata] harmless against any and all claims, suits, actions, proceeding, losses, damages, liabilities, costs and expenses arising from or attributable to, any allegations" that Versata's use of Think3's Property "infringes any copyright, trademark, trade secret, patent or other proprietary right [...]."   As alleged herein, Dr. Ferri, purporting to act on behalf of Think3, has asserted that Versata's use of the Intellectual Property, logo and trademarks in accordance with the terms of the Agreement is "prohibited" and subject to "prosecution." Moreover, Dr. Ferri, as the Italian Trustee purporting to act on behalf of Think3—not merely the Italian Branch of Think3—has notified the public and Versata's customers that Versata is forbidden to sublicense or market Think3 Products or to use its trademarks and logos, and that all proceeds of any Intellectual Property or Products of Think3 must be paid to the Italian Trustee or his nominee.

22.    Versata disputes all of these assertions and allegations by the Italian Trustee and contends that Versata is entitled to all of the rights granted to it under the Agreement.   In particular, Versata asserts (a) that Dr. Ferri, the Trustee of the Italian Branch of Think3, has no authority to act outside of Italy with respect to Think3, and specifically lacks authority to take any actions to limit, interfere with, or in any way impact the rights and operations of Think3, the Delaware corporation with whom Versata contracted, and (b) that, in any event, the Trustee has no authority to invalidate or undermine Versata's rights under the Agreement after Versata paid the full consideration under the Agreement.  Further, the Trustee lacks authority to interfere with Versata's use of the Intellectual Property or with Versata's customers.  The Trustee has no

authority to prevent Versata from enforcing its customer contracts or to interfere with Versata's recovery of any amounts owing to Versata from its customers.

23.    Versata further contends that under Texas law, which governs its Agreement with Think3, the grant of an exclusive license to Versata in exchange for the paid-up consideration of $3,000,000 to Think3 operated as an executed transfer of Think3's copyrights to Versata.  As such, the Agreement is not a mere executory agreement that a trustee in bankruptcy—even a properly-appointed U.S. bankruptcy trustee—would be free to terminate.

24.    By virtue of the unauthorized and overreaching actions of Dr. Ferri purporting to act as the representative of Think3, and the actions of Think3 performed at the direction of the Italian Trustee, there is an actual controversy between Versata and Think3 with respect to Versata's rights arising under the Agreement.  Specifically, actual controversy exists concerning:

(a)    who has the authority to direct the conduct of Think3;

(b)    whether Versata's exclusive rights under the Agreement (including the exclusive license to Versata of all of the Think3 Intellectual Property and Versata's contracts with and rights to proceeds from its customers) can be or have been terminated or impaired;

(c)    who is entitled to receive the license and maintenance fees from CAD and PLM software end users;

(d)    who, if anyone, other than Versata is entitled to enforce rights as to Versata customers and sublicensees;

(e)    whether Think3 itself  is responsible for the breaches of the Agreement, harms and wrongs done to Versata by its actions performed at the direction of the Italian Trustee; and

(f)    whether Think3 is required to defend, indemnify and hold Versata harmless from all claims and allegations that Versata's actions (as authorized by the Agreement) constitute an infringement of any intellectual property rights of Think3 and those acting for or through it, such as the Italian Trustee.

25.    Pursuant to 28 U.S.C. §§ 2201, 2202, an actual and substantial controversy exists between Versata and Think3, acting on its own or at the direction of the Italian Trustee.

26.     Versata seeks a declaration that:

(a)     neither Think3 nor any person purporting to act on its behalf (including the Italian Trustee) has the right to terminate the Agreement and that Versata continues to have all of the rights granted to it under the Agreement;

(b)     Think3 is obligated to defend, indemnify and hold Versata harmless from all "claims, suits, actions, proceeding, losses, damages, liabilities, costs and expenses arising from or attributable to, any allegations"—including, without limitation, those asserted or to be asserted by the Italian Trustee purporting to act on behalf of Think3—alleging that Versata is not entitled to exercise any rights to use or market Intellectual Property or Marks as set forth in the Agreement, or to deal with and recover contract payments from Versata customers;

(c)     the Italian Trustee is not entitled to manage Think3, a Delaware corporation, or to terminate or interfere with its Agreement with Versata or Versata customers in any way that impacts Versata's rights or customers;

(d)     Think3 shall immediately cease and desist from informing the public or any Think3 or Versata customers that Versata is not entitled to sublicense Think3 Products or Intellectual Property or to use Think3 Marks or to deal with and recover contract payments from Versata customers;

(e)     Think3 shall immediately restore the content and control of the Websites to the content and control in place prior to commencement of the Italian Bankruptcy Case;

(f)     Think3 shall immediately stop selling and marketing Unauthorized Sublicenses or any other related Products and shall remit any payments collected in connection with the sale of such Unauthorized Sublicenses and/or related Products to Versata; and

(g)     Think3 shall immediately stop attempting to collect sublicensing fees or other payments owed by customers to Versata and shall refund to Versata all such sums received by or on behalf of Think3.

## <u>TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS</u>

27.     Plaintiff Versata incorporates by reference paragraphs 1 through 26 above.

28.     Pursuant to its Agreement with Think3, Versata had and has the exclusive right to exploit commercially and to sublicense Think3 Products and Intellectual Property as provided in the Agreement, free of any restraint by Think3 or the Italian Trustee.   Pursuant to that Agreement, Versata is the successor in interest to Think3 on numerous sublicense and maintenance contracts with end users under which license fees and maintenance payments are payable to Versata.   Versata has also entered into additional direct contracts with end users of Think3 Products under which the customers' license and/or maintenance payments are payable to Versata.

29.     Think3, and the Italian Trustee purporting to control Think3, are aware of Versata's contractual relations with end users and have acted and continue to act to disrupt and interfere with those contractual relationships and to induce the end users' breach thereof. Specifically, without justification, Think3, at the direction of the Italian Trustee, has wrongfully informed customers that Versata has no right to sublicense Think3 products or to use its trademarks or logos.   Think3 has directed customers to remit payment to Think3 or to the Italian Trustee rather than to Versata.

30.     As a direct and proximate consequence of Think3's conduct performed at the direction of the Italian Trustee, contractual relations between Versata and its customers have been disrupted and Versata has sustained damage as a direct result.   Versata has suffered and will continue to suffer irreparable loss and injury and other damages unless Think3, acting on its own and at the direction of the Italian Trustee, is enjoined by this Court from interfering with plaintiff's contractual relations.

31.     On information and belief, Think3, at the direction of the Italian Trustee, has acted intentionally and with a willful and conscious disregard of the rights of Versata to induce a disruption and/or breach of the contracts, as alleged above, between Versata and its customers. On information and belief, these acts of interference were unlawful, and were without privilege, justification, just cause or excuse, and were accompanied by a specific intent to cause substantial injury to Versata.   The acts of Think3, performed at the direction of the Italian Trustee, when

viewed objectively at the time such acts occurred, involved an extreme degree of risk, considering both the probability and magnitude of the potential harm to Versata. Think3, acting at the direction of the Italian Trustee, nevertheless engaged in such acts, proceeding with conscious indifference to the rights, safety and welfare of Versata, despite Think3's actual subjective awareness of the risk involved through the Italian Trustee. Versata is therefore entitled to recover exemplary damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code in addition to the direct compensatory damages that Versata has suffered.

## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE AND PROSPECTIVE CONTRACT

32.     Versata incorporates by reference paragraphs 1 through 31 above.

33.     Versata maintains business and economic relationships with many customers based on or as a result of its exclusive rights with respect to the Think3 Products and Intellectual Property, with probable future economic benefit flowing therefrom. Specifically, there is a reasonable probability that Versata would have renewed sublicensing and maintenance agreements with existing customers and entered into additional sublicensing and maintenance agreements with new customers, absent the intentional acts of interference by Think3 acting at the direction of the Italian Trustee.

34.     Think3, acting under the direction of the Italian Trustee, has knowledge of these prospective business relations and has acted intentionally and maliciously to disrupt them and to prevent these future relationships and contractual agreements from coming into existence.

35.     As a direct and proximate cause of Think 3's conduct directed by the Italian Trustee, business relations between Versata and potential customers have been disrupted and Versata has sustained direct damages as a result. Versata has suffered and will continue to suffer irreparable loss and injury and other damages, unless and until Think3 is enjoined by this Court from interfering with plaintiff's business relationships and prospective business relationships, whether or not such interference is directed by the Italian Trustee or performed by the Italian Trustee purporting to act on behalf of Think3.

36.     On information and belief, Think 3's actions at the direction of the Italian Trustee were malicious, without privilege or justification, and were intentionally engaged in with the express purpose of interfering with or preventing further relationships and agreements between Versata and third parties, and to harm Versata.  Furthermore, Think3's acts of interference by the Italian Trustee were accompanied by a specific intent to cause substantial injury to Versata, or Think 3's acts of interference by the Italian Trustee, when viewed objectively at the time such acts occurred, involved an extreme degree of risk, considering both the probability and magnitude of the potential harm to Versata.  Think3 nevertheless engaged in such acts by the Italian Trustee, proceeding with conscious indifference to the rights and welfare of Versata, despite Think3's actual subjective awareness of the risk involved by the Italian Trustee.  Versata is therefore entitled to recover exemplary damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code in addition to its direct compensatory damages.

## BREACH OF CONTRACT OR RESTITUTION

37.     Versata incorporates by reference paragraphs 1 to 36, above.

38.     By informing the public that Versata is not entitled to sublicense Think3 Products and Intellectual Property, or to use Think3 trademarks, or to deal with and collect payments from its customers, and by continuing to exploit the Products and Intellectual Property itself and by asserting that the Agreement has been terminated and that Versata is infringing on the intellectual property rights granted to it under the Agreement, Think3, acting at the direction of the Italian Trustee, has breached and continues to breach the express and implied terms of the Agreement.  By failing to defend, indemnify and hold Versata harmless from the allegations of violation of intellectual property rights made by and at the direction of the purported Italian Trustee, Think3 has breached the Agreement.  As a direct result of these breaches, Versata has been damaged in an amount in excess of $75,000, exclusive of interest and costs, including in the amount of $3,000,000 paid under the Agreement, plus all sums invested by Versata in its business relating to or based on that Agreement, plus all additional damages proximately caused by these breaches, in an amount according to proof.

39.     The Italian Trustee and Think3, acting at the direction of the Italian Trustee, have asserted that the Agreement was terminated effective May 2, 2011.  Versata disputes that Think3 or the Italian Trustee has the right to terminate the Agreement or to do any of the other acts about which plaintiff complains in this Complaint.  If the Agreement can be terminated or rescinded, however, Versata will not have received the consideration for which it has already paid Think3 $3,000,000; accordingly, Think3 has been unjustly enriched in an amount of at least $3,000,000.  Under such circumstances Versata is entitled to damages or restitution from Think3 in the amount of no less than $3,000,000, plus all sums invested by Versata in its business based on that Agreement, plus all amounts for which Versata may be liable to its customers as a result of the termination of the Agreement.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Versata prays for the following relief against Think3:

(a)     For a Declaration that neither Think3 nor any person purporting to act on its behalf (including the Italian Trustee) has the right to terminate the Agreement and that Versata continues to have all of the rights granted to it under the Agreement plus all related rights of Versata under applicable law;

(b)     For a Declaration  that Think3 is obligated to defend, indemnify and hold Versata harmless from all "claims, suits, actions, proceeding, losses, damages, liabilities, costs and expenses arising from or attributable to, any allegations"—including without limitation those asserted or to be asserted by Dr. Ferri as the purported Italian Trustee of Think3—that Versata is not entitled to exercise any rights to use Intellectual Property or Marks as set forth in the Agreement;

(c)     For a Declaration that under the laws governing the interpretation of the Agreement, the Agreement constituted an executed transfer of copyright ownership from Think3 to Versata;

(d)     For a Declaration that Versata is the owner of all copyrights and other intellectual property rights in all modifications or improvements that Versata made relating to the CAD and PLM Products;

(e)     For a Declaration that Dr. Ferri, the purported Italian Trustee, is not entitled to manage Think3, a Delaware Corporation, or to terminate or interfere with its Agreement with Versata, at least outside of Italy;

(f)     For a Declaration that Think3 shall immediately cease and desist from informing the public or any Think3 or Versata customers that Versata is not entitled to sublicense Think3 Products or Intellectual Property or to use Think3 Marks or to deal with or collect money from its customers;

(g)     For a Declaration that Think3 shall immediately restore the content and control of the Websites to the content and control in place prior to commencement of the Italian Bankruptcy Case;

(h)     For a Declaration that Think3 shall immediately stop selling and marketing Unauthorized Sublicenses or any other related Products and shall remit any payments collected in connection with the sale of such Unauthorized Sublicenses and/or related Products to Versata; and

(i)     For a Declaration that Think3 shall immediately stop attempting to collect sublicensing fees or other payments owed by customers to Versata and to pay to Versata all such sums received by or on behalf of Think3;

(j)     For preliminary and permanent injunctive relief against further tortious interference with Versata's contractual relations with its customers;

(k)     For preliminary and permanent injunctive relief against further tortious interference with Versata's prospective business advantage and prospective contracts;

(l)     For an award of damages in an amount to be proved at trial, for all damages caused by Think3's breach of contract and tortious interference;

(m)     For an award of attorney's fees and costs of suit;

(n)     For an award of exemplary damages; and

(o)     For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury of any and all issues triable of right by a jury in the above-captioned case.

Dated:  May 16, 2011                    Respectfully submitted,

                                        /s/ Patton G. Lochridge
                                        Patton G. Lochridge
                                        State Bar No. 12458500
                                        Travis C. Barton
                                        State Bar No. 00790276
                                        McGinnis Lochridge & Kilgore, L.L.P.
                                        600 Congress Avenue, Suite 2100
                                        Austin, TX 78701
                                        Telephone: (512) 495-6000
                                        Fax: (512) 495-6093
                                        E-mail: plochridge@mcginnislaw.com
                                        E-mail: tcbarton@mcginnislaw.com

*OF COUNSEL:*

**MORRISON & FOERSTER L.L.P.**
Andrew E. Monach (***not yet admitted Pro Hac Vice***)
California State Bar No. 87891
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Fax: (415) 268-7522

                                        **ATTORNEYS FOR PLAINTIFF**
                                        **VERSATA FV-LLC**

**PLAINTIFF'S ORIGINAL COMPLAINT**                    14

# TECHNOLOGY LICENSE AGREEMENT

THIS TECHNOLOGY LICENSE AGREEMENT ("Agreement") is made and entered into effective as of October 7, 2010 ("Effective Date") by and between:

**Think3, Inc.,** a company organized and existing under the laws of the State of Delaware with its principal place of business located at 6011 W. Courtyard Dr., Suite 250, Austin, Texas 78730, USA ("Licensor"),

and

**Versata FZ-LLC**, a company organized and existing under the laws of Dubai Technology and Media Free Zone, with its principal place of business located at 707-708 Al Thurayal, Dubai Media City, PO Box 502092, Dubai, United Arab Emirates, ("Licensee").

(Licensor and Licensee are collectively referred to as the "Parties" and individually referred to as "Party")

## RECITALS

A.      Licensor is the owner, or authorized licensee, of certain Intellectual Property (as defined herein) relating to the design, development, manufacture, marketing, distribution, sale and license of the Products (as defined herein).

B.      Licensee desires to license from Licensor the right to utilize such Intellectual Property in the design, development, manufacture, marketing, distribution, and support of the Products within the Territory (as defined herein).

C.      Licensor is willing to grant to Licensee a license to utilize such Intellectual Property solely in accordance with the terms and conditions set forth in this Agreement.

Licensor and Licensee agree as follows:

Section 1 - Definitions

For purposes of this Agreement, the following terms shall have the meanings and definitions set forth below:

1.1      "Affiliate" of a Party shall mean and include any entity or association controlled by, controlling or under common control with such Party. For purposes of this definition, the term "control" shall mean the ownership of more than fifty percent (50%) of the voting shares in any entity or association.

1.2      "Confidential Information" shall mean and include all information, not in the public domain, that relates to any or all of the Products and/or the Intellectual Property, or to the business, plans, affairs or activities of Licensor, or its licensors.  Confidential Information may be communicated electronically, orally, visually, in writing or in any other recorded or tangible form.  All information and data shall be considered to be Confidential Information hereunder (a) if Licensor has marked them as such, (b) if Licensor, electronically, orally or in writing, has advised Licensee of their confidential nature, or (c) if due to their character or nature, a reasonable person in a like position and under like circumstances would treat them as confidential.

1.3     "Intellectual Property" shall mean and include any and all inventions, patents, patent applications, and patent disclosures (including all related divisions, continuations, continuing prosecution applications, continuations in part, reissues, renewals, reexaminations, and extensions thereof anywhere in the world), works of authorship, copyrights, Marks, trade secrets, semiconductor design rights, computer programs (in source code and object code form), flow charts, formulae, enhancements, updates, modifications, translations, adaptations, information, specifications, designs, process technology, manufacturing requirements, quality control standards, information and supply chain information systems, and any other intellectual and industrial property rights, intangible property rights, and proprietary rights, anywhere in the world, whether registered or unregistered, which are owned, licensed, or otherwise acquired by Licensor prior to or after the Effective Date, and any and all additions, modifications, enhancements, updates, extensions, derivative works, formulations or further developments thereto, which pertain to the development, testing, installation, implementation, customization, optimization, configuration, operation, support, promotion, marketing, advertising, sale, or other use of the Products.

1.4     "Marks" shall mean and include those trademarks, service marks, trade names, trade dress, logos and similar designations, whether registered or unregistered, used in connection with any or all of the Products.

1.5     "Products" shall mean and include individually and/or collectively, as the context requires, all Licensor CAD and PLM products which utilize, embody or incorporate the Intellectual Property and all related maintenance and support contracts and services ("Maintenance").

1.6     "Territory" shall mean the entire world excluding China, except for the case where a multinational company that is headquartered in the Territory wishes to license the Products both within the Territory and in which case the definition of Territory for that client will be extended to include China; *provided, however,* that the Territory may be amended from time to time as agreed between the Parties.

<u>Section 2 - Grant and Scope of License</u>

2.1     Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee, and Licensee hereby accepts, an exclusive right and license, with the right to grant and authorize sublicenses, to utilize the Intellectual Property, to (a) manufacture, have manufactured, use, sell, offer for sale, or import the Products in or into the Territory, (b) use, reproduce, distribute, perform, or display the Products in the Territory, (c) make (or have made) modifications, improvements, enhancements or further developments to the Products in the Territory, and (d) otherwise market, support, and commercially exploit the Products within the Territory.  Licensor also grants to Licensee such additional rights required, if any, to manufacture, market, distribute, license and sell the Products, pursuant to any agreement between the Parties regarding global deals/transactions.

2.2     Without limiting the generality of Section 2.1 hereof, Licensor also hereby grants to Licensee, and Licensee hereby accepts, an exclusive right and license, with the right to grant and authorize sublicenses, to utilize the Marks solely in conjunction with Licensee's manufacturing, marketing, distribution, sale, license, support and use of the Products, within the Territory, solely in accordance with the terms and conditions of this Agreement.

2.3     Licensor also hereby grants to Licensee, and Licensee hereby accepts, an exclusive right and license to enforce the Intellectual Property in the Territory.  Licensee or its designee shall be solely responsible for taking all actions, in the courts, administrative agencies or otherwise, to prevent or enjoin any and all such infringements and unauthorized uses of the Intellectual Property, including the right to keep all damage awards related thereto; provided, however, that Licensor shall furnish Licensee with such

assistance as Licensee shall reasonably request in connection with any such action to prevent or enjoin any such infringement or unauthorized use of any of the Intellectual Property, and shall also provide prompt written notice of actual or suspected infringements to Licensee.

<u>Section 3 - Licensor's Responsibilities</u>

3.1     Licensor shall make available to Licensee (or Licensee's designee) a data package that includes all of the Intellectual Property, and such other documents that contain, embody or describe such of the Confidential Information as Licensor reasonably determines to be necessary or appropriate for Licensee's efficient manufacture/production, marketing, distribution, sale/license and use of the Products in accordance with the terms and conditions of this Agreement.

3.2     At Licensee's request, Licensor shall furnish Licensee with reasonable technical assistance relating to the manufacture/production, marketing, distribution, sale/license, and/or use of any of the Products.

3.3     At Licensee's request, Licensor shall furnish Licensee with a reasonable quantity of Licensor's promotional materials for the Products.  Licensee shall have the right to reproduce, modify and/or translate any or all such promotional materials, as Licensee reasonably determines to be necessary or appropriate for the effective marketing and distribution of the Products throughout the Territory; *provided, however*, that Licensee's rights and obligations with respect to all modifications and translations of the promotional materials furnished by Licensor under this Section 3.3 shall be as provided in Section 4.3 hereof.

<u>Section 4 - Licensee's Responsibilities</u>

4.1     At the request of Licensor from time to time during the continuance of this Agreement, Licensee shall furnish Licensor with samples of each Product manufactured/produced by Licensee (or its contractors) hereunder, in order to permit Licensor to confirm that such Product conforms to all of the specifications and/or documentation therefor.  If, in Licensor's reasonable opinion, any such Products fail to conform to the specifications and/or documentation therefor, Licensee shall promptly correct all such deficiencies in such Products.

4.2     In accordance with the rights licensed to Licensee under Section 2.2, Licensee shall affix the Marks to all of the Products manufactured/produced by Licensee (or its contractors) hereunder, strictly in accordance with Licensor's trademark standards and specifications as communicated by Licensor to Licensee from time to time.  Licensee shall not affix to, or otherwise use in conjunction with, any of the Products any other trademark, trade name, symbol or logo, and shall not use any of the Marks in conjunction with any products other than the Products, except as specifically authorized in writing by Licensor.  All use of the Marks and trademark goodwill associated therewith shall inure to the benefit of the legal owner of the Marks.  Licensee shall not adopt or use any trademark, trade name, symbol or logo that is confusingly similar to any of the Marks, and shall not seek to register in its own name any of the Marks, or any translations or transliterations thereof, in any country within or outside of the Territory.

4.3     Licensee may prepare such advertising and promotional materials, including modifications and translations of the promotional materials furnished by Licensor to Licensee under Section 3.3 hereof, which, in the reasonable opinion of Licensee are necessary or appropriate for the effective marketing and distribution of the Products within the Territory; *provided, however*, that all such advertising and promotional materials shall be subject to review and approval by Licensor, which approval shall not be

unreasonably withheld or delayed, prior to distribution by Licensee to customers and prospective customers in the Territory.

4.4     At all times during the continuance of this Agreement, Licensee shall maintain adequate service and support facilities within the Territory for all Products manufactured/produced hereunder by Licensee. Licensee shall be solely responsible for providing all support services, including, but not limited to, technical support and warranty services, in accordance with the applicable specifications and documentation, for all Products within the Territory manufactured/produced by Licensee hereunder. Licensee shall be solely responsible for determining the terms, conditions and limitations of all warranties made by Licensee with respect to all such Products manufactured/produced by Licensee hereunder, in accordance with applicable laws, regulations and governmental orders and local market conditions and requirements within the Territory.

4.5     Upon Licensor's request, Licensee shall submit to Licensor quarterly reports of Licensee's activities under this Agreement.

4.6     Upon reasonable notice from Licensor, Licensee shall permit Licensor's representatives, during normal business hours, to inspect Licensee's facilities, and to review Licensee's books and records, as reasonably necessary in order to permit Licensor to confirm Licensee's compliance with its obligations under this Agreement.

<u>Section 5 - Consideration</u>

5.1     In consideration for the rights and licenses granted to Licensee by Licensor under this Agreement, Licensee shall pay to Licensor royalties equal to the amounts specified in the Royalty Schedule attached hereto as <u>Exhibit 5.1</u>. On a periodic basis, the Parties shall review Licensee's use of the rights granted under this license, and the income attributable to the use of those rights, and shall adjust the royalties prospectively or retrospectively as necessary so that the rate will be an arm's length rate.

5.2     All royalties payable by Licensee under Section 5.1 hereof shall be paid within *thirty (30)* calendar days of receipt by Licensee of Licensor's quarterly invoice or other requests for payment therefor. Unless otherwise agreed between the Parties, all royalties payable hereunder shall be paid in United States Dollars. For purposes of determining the United States Dollars amount of any and all royalties payable hereunder, all amounts received by Licensee in any currency other than United States Dollars shall be converted into United States Dollars at Licensor's internal rate of exchange as of the last day of the calendar quarter in which such amounts were received. In the event that Licensee fails to make any payment hereunder on the due date therefor, such overdue amount shall bear interest, from the due date to the date such amount is paid in full, at an arm's-length interest rate.

5.3     If Licensee is required under any applicable law, regulation or government order within the Territory to withhold any taxes or other governmental charges on any amounts payable by Licensee to Licensor under this Section 5, Licensee shall withhold, and shall pay over to the appropriate governmental authorities, all such taxes and other governmental charges. Licensee shall obtain, and shall furnish to Licensor on a timely basis, official tax receipts or other evidence of payment of all such taxes and other governmental charges, sufficient to permit Licensor to establish Licensor's right to a credit for such taxes and other governmental charges against Licensor's income tax liability. Licensee shall provide Licensor with such assistance as Licensor shall reasonably request in connection with any application by Licensor to qualify for the benefit of a reduced rate of withholding taxation under the terms of any applicable Income Tax Treaty.

5.4     If any royalty amount paid by Licensee to Licensor under Section 5.1 hereof is subject to adjustment by any governmental tax authority, Licensee shall pay to Licensor, or Licensor shall pay to Licensee, as the case may be, the full amount of such adjustment.

Section 6 - Confidential Information

6.1     Licensee hereby acknowledges that all of the Confidential Information disclosed or revealed to Licensee hereunder is disclosed solely to permit Licensee to exercise its rights and perform its obligations under this Agreement.  Licensee shall not use any of the Confidential Information for any other purpose, and shall not disclose or reveal any of the Confidential Information to any third party without the prior written authorization of Licensor, which Licensor may withhold in its sole discretion; *provided, however*, that the prior written authorization of Licensor shall not be required for Licensee to disclose the Confidential Information to those of Licensee's Affiliates, employees, suppliers and subcontractors that (a) require access to the Confidential Information in order to permit Licensee to exercise its rights and perform its obligations hereunder, and (b) have executed a nondisclosure agreement, in a form reasonably satisfactory to Licensor, which effectively prohibits the unauthorized use or disclosure of the Confidential Information.

6.2     Licensee shall implement all reasonable security measures, and shall take all reasonable actions, including, but not limited to, the initiation and prosecution of legal or administrative actions, to prevent the unauthorized use, appropriation or disclosure of any of Licensor's Confidential Information.

6.3     Licensee's obligations under Sections 6.1 and 6.2 hereof shall not apply to the extent, but only to the extent, that any of the Confidential Information:

> (a)     passes into the public domain through no fault of Licensee;

> (b)     was known to Licensee prior to disclosure hereunder by Licensor, or is independently developed by Licensee without reference to any of the Confidential Information;

> (c)     is disclosed to Licensee by a third party that is under no duty of nondisclosure to Licensor; or

> (d)     is required to be disclosed under any applicable law, regulation or governmental order of any country within the Territory; *provided, however*, that Licensee shall give prior written notice to Licensor of such legal disclosure requirement so that Licensor can take appropriate action to protect the confidentiality, and prevent the unauthorized use or appropriation of such Confidential Information.

6.4     Licensee's obligations under this Section 6 shall survive the termination of this Agreement for any reason whatsoever.

Section 7 - Intellectual Property Rights

7.1     Licensee hereby acknowledges that Licensor is the owner, or authorized licensee, of all rights, title and interests in and to all of the Intellectual Property and Confidential Information licensed to Licensee hereunder (collectively, "Licensor's Property"), and Licensee shall acquire no rights whatsoever in or to any of Licensor's Property, except as specifically provided in this Agreement.  Licensee shall not utilize any of Licensor's Property for any purpose whatsoever, except as authorized herein, and shall not

take any action which may, in the reasonable opinion of Licensor, adversely affect or impair Licensor's rights, title and interests in and to Licensor's Property.

7.2     Licensee shall take such actions, and shall provide Licensor with such assistance, as Licensor shall reasonably request, in order to protect and perfect Licensor's rights, title and interests in and to Licensor's Property throughout the Territory.  All of the Products manufactured/produced, marketed, distributed and/or licensed by Licensee hereunder shall bear such proprietary rights notices as Licensor shall designate.

7.3     Subject to the limitation of liability set forth in Section 8 hereof, Licensor or its designee shall defend, indemnify and hold Licensee harmless against any and all claims, suits, actions, proceedings, losses, damages, liabilities, costs and expenses arising from, or attributable to, any allegation that Licensee's use of Licensor's Property in accordance with the terms and conditions of this Agreement infringes any copyright, trademark, trade secret, patent or other proprietary right of any third party existing in the Territory.  Licensor's indemnity obligation, as set forth in this Section 7.4, shall be subject to the following conditions: (a) Licensee shall provide Licensor with timely written notice of any and all claims that are within the scope of Licensor's indemnity hereunder; (b) Licensor or its designee shall be solely responsible for the defense, settlement and discharge of any and all such claims; and (c) Licensee shall furnish Licensor with such assistance as Licensor shall reasonably request in connection with the defense, settlement and/or discharge of any and all such claims.

7.4     If the use of any of Licensor's Property is, or in Licensor's reasonable opinion is likely to be, prohibited by an order or injunction of a court of competent jurisdiction, Licensor shall provide written notice thereof to Licensee, and Licensee shall immediately cease all use of such of Licensor's Property.

## Section 8 - Limitation of Liability

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NEITHER PARTY TO THIS AGREEMENT SHALL BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR INCIDENTAL DAMAGES ARISING FROM, OR ATTRIBUTABLE TO, THIS AGREEMENT AND/OR THAT PARTY'S PERFORMANCE HEREUNDER, WHETHER ARISING IN CONTRACT, TORT, BY OPERATION OF LAW, OR OTHERWISE, EVEN IF THAT PARTY HAS BEEN PLACED ON NOTICE OF THE POSSIBILITY OF SUCH DAMAGES.

## Section 9 - Term and Termination

9.1     This Agreement shall enter into effect on the Effective Date hereof, and shall remain in full force and effect until terminated by mutual written agreement between the Parties, or in accordance with the provisions of this Section 9.

9.2     In the event that either Party (the "Breaching Party") shall commit any material breach or default of any of its obligations under this Agreement, the other Party (the "Non-Breaching Party") may give the Breaching Party written notice thereof and demand that such breach or default be cured immediately.  If the Breaching Party fails to cure such breach or default within thirty (30) calendar days after the date of the Non-Breaching Party's written notice hereunder, the Non-Breaching Party may terminate this Agreement immediately upon giving written notice of termination hereof to the Breaching Party.  Termination of this Agreement in accordance with this Section 9.2 shall not adversely affect or impair the Non-Breaching Party's right to pursue any legal remedy, including the right to recover damages for all harm suffered or incurred as a result of the Breaching Party's breach or default hereof.

9.3    To the extent permitted under applicable law, Licensor may terminate this Agreement by written notice, to take effect immediately upon receipt thereof by Licensee, in the event that: (a) Licensee breaches any of its obligations, as reasonably determined by Licensor, under Section 6 (Confidential Information) or Section 7 (Intellectual Property Rights) of this Agreement; (b) Licensee goes into bankruptcy, voluntary or involuntary dissolution, is declared insolvent, makes an assignment for the benefit of creditors, or suffers the appointment of a receiver or trustee over all or substantially all of its assets or properties; or (c) any unrelated third party appropriates and/or acquires by law, regulation, order or any other involuntary means the intellectual property rights embodied in or related to any of Licensor's Property or the rights granted to Licensee hereunder, including, without limitation, through expropriation, or attempts or undertakes such action; *provided, however,* that Licensor may elect to terminate Licensee's right and license hereunder only with respect to the jurisdiction in which such involuntary appropriation or taking occurs.

9.4    This Agreement shall automatically terminate effective immediately before the enactment of any law, regulation or governmental order is enacted or issued, which, in the reasonable opinion of Licensor, jeopardizes or impairs the enforceability of any intellectual property rights in any of Licensor's Property in any country within the Territory, unless Licensee, upon written request from Licensor, agrees to refrain from utilizing Licensor's Property in such country.

9.5    Immediately upon termination of this Agreement for any reason whatsoever, Licensee shall cease all use of Licensor's Property, *provided that* Licensor may, at its sole option, permit Licensee to use such of Licensor's Property as Licensee reasonably requires to (a) sell/license or otherwise dispose of Licensee's existing inventory of the Products manufactured/produced by Licensee hereunder, and (b) provide service and support with respect to the Products licensed by Licensee to its customers within the Territory, in accordance with Section 4.4 hereof.

9.6    Subject to the provisions of Section 9.5 hereof, immediately after the date of termination hereof, Licensee shall return to Licensor all copies of all documents and other materials that contain or embody any of Licensor's Property that are in the possession of Licensee as of the date of termination. Any and all advertising and promotional materials that bear any of the Marks in the possession of Licensee as of the date of termination shall be promptly delivered to Licensor, or destroyed, except to the extent reasonably required by Licensee for use in connection with Licensee's disposition of its existing inventory of Products, and thereafter, Licensee shall not utilize any of the Marks for any purposes whatsoever.

9.7    Within thirty (30) calendar days after the date of termination of this Agreement, Licensee shall provide Licensor with the report provided for in Section 4.5 hereof for the quarter in which termination of this Agreement occurs, and shall concurrently tender all royalties payable by Licensee to Licensor hereunder with respect to that quarter and all other amounts payable by Licensee to Licensor hereunder which have accrued, but which remain unpaid as of the date of termination. Termination of this Agreement for any reason whatsoever shall not relieve Licensee of its obligations under Section 6 (Confidential Information), Section 7 (Intellectual Property Rights), or Section 11 (Compliance with Applicable Laws) of this Agreement.

Section 10 - Assignment

Neither Party shall have the right or power to assign, delegate or otherwise transfer any of its rights or obligations arising under this Agreement without the prior written authorization of the other Party, and such assignment, delegation or other transfer shall then be effective only upon written agreement of the assignee, delegate or transferee to assume and be bound by the terms, conditions and limitations of this Agreement to the same extent it would have been bound had such assignee, delegate or transferee been an original Party to this Agreement; *provided, however*, that the prior written authorization of the other Party shall not be required for either Party to assign, delegate, subcontract or otherwise transfer any of its rights or obligations arising under this Agreement to any existing or newly formed Affiliate of either Party.

Section 11 - Compliance with Applicable Laws

11.1    In the exercise of their respective rights and the performance of their respective obligations under this Agreement, each Party shall comply with all applicable laws, regulations and governmental orders. Licensee shall, at its own expense, obtain and maintain in full force and effect throughout the continuance of this Agreement, all licenses, permits, authorizations, approvals and government filings and registrations ("Approvals") necessary or appropriate for the exercise of its rights and the performance of its obligations hereunder. Upon termination of this Agreement, Licensee shall transfer all such Approvals to Licensor, or to such other third party as Licensor may designate, to the extent permitted under applicable laws.

11.2    Without limiting the generality of Section 11.1, Licensee acknowledges and agrees that the Products, Intellectual Property and Confidential Information of Licensor are subject to export control by the United States Government. Licensee shall strictly comply with all requirements of United States laws and regulations related to such Products, Intellectual Property and Confidential Information, including, without limitation, U.S. Export Administration Regulations, 15 C.F.R. Parts 730-774, and all licenses and authorizations issued under such laws and regulations, and Licensee shall fully cooperate with Licensor in securing any export license and authorizations required thereby. Licensee agrees that it shall not, and shall cause its representatives, employees, agents, contractors and customers to agree not to, export, reexport, divert, release, transfer, or disclose any such Products, Intellectual Property, or Confidential Information, or any direct product thereof, to any prohibited or restricted destination, end-use or end user, except in accordance with all United States export control laws and regulations. Licensee shall make its records available to Licensor upon reasonable request to permit Licensor to confirm Licensee's compliance with its obligations as set forth in this Section 11.2. Licensee's obligations as set forth in this Section 11.2 shall survive expiration or termination of this Agreement for any reason whatsoever.

11.3    Each Party agrees that it shall comply fully with all applicable anti-corruption and anti-bribery laws, including, but not limited to, the United States Foreign Corrupt Practices Act. Without limiting the generality of the foregoing obligation, each Party agrees that it shall not make, authorize, offer or promise to make or give any money or any other thing of value, directly or indirectly, to any government official or employee, political party, or candidate for political office for the purpose of securing any improper or unfair advantage or obtaining or retaining business in connection with the activities contemplated hereunder. Any breach or violation of any provision contained in this Section 11.3 by either Party shall be grounds for immediate termination of this Agreement by the other Party.

Section 12 - Choice of Law

This Agreement, and any disputes arising out of or in connection with this Agreement, shall be governed by and construed in accordance with the laws of Texas, excluding its rules governing conflicts of laws.

Section 13 - General Provisions

13.1     Independent Contractors.  In the exercise of their respective rights, and the performance of their respective obligations under this Agreement, the Parties are, and shall remain, independent contractors. Nothing in this Agreement shall be construed (a) to constitute the Parties as principal and agent, franchisor and franchisee, partners, joint venturers, co-owners or otherwise as participants in a joint undertaking, or (b) to authorize either Party to enter into any contract or other binding obligation on the part of the other Party, and neither Party shall represent to any third party that it is authorized to enter into any such contract or other obligation on behalf of the other Party.

13.2     Accounting Method.  Costs, revenue, the timing for the recognition of revenue and any other financial measure in this Agreement shall be determined under U.S. Generally Accepted Accounting Principles.

13.3     Waivers.  Either Party's failure to assert any of its rights hereunder, including but not limited to the right to terminate this Agreement due to a breach or default by the other Party, shall not be deemed to constitute a waiver by that Party of its right thereafter to enforce every provision of this Agreement in accordance with its terms.

13.4     Subject Headings.  The subject headings of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.

13.5     Severability.  In the event that any provision hereof is found invalid or unenforceable pursuant to a final judicial decree or decision, the remainder of this Agreement will remain valid and enforceable according to its terms.  In the event of such partial invalidity, the Parties shall seek in good faith to agree on replacing any such legally invalid provision with a provision which, in effect, will most nearly and fairly approach the effect of the invalid provision.

13.6     Language of the Contract; Counterparts.  Both Parties agree that English shall be the language of interpretation of this Agreement.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together constitute one and the same instrument.

13.7     Notices.  All notices, reports, invoices and other communications between the Parties shall be in writing and sent by facsimile or email, by registered mail, postage prepaid and return receipt requested, or by overnight courier.  All such communications shall be sent to a Party at the address shown at the beginning of this Agreement or to such other address of which the receiving Party has given prior notice to the sending Party.  All such communications shall be effective upon receipt by the sender of confirmation of the delivery, or where no such confirmation is possible, when received.

13.8     Entire Agreement and Amendments.  This Agreement, including the exhibits attached hereto, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements between the Parties, whether written or oral, relating to the same subject matter.  No modification, amendments or supplements to this Agreement shall be effective for any

purpose unless in writing and signed by each Party.  Approvals or consents hereunder of a Party shall also be in writing.

13.9    <u>Marking</u>.   During the term of the Agreement, Licensee shall permanently mark all Products that would otherwise infringe a Licensor patent with a patent notice sufficient to comply with Title 35 of the United States Code Section 287 or its successor or, if the applicable patent is a non-U.S. patent, with a marking prescribed or permitted by the appropriate foreign issuing country.

*The remainder of this page intentionally left blank*

The Parties have caused this Agreement to be executed by their duly authorized representatives effective as of the Effective Date.

Think3, Inc.

By: _____

Name: Andrew S. Price

Title: VP Finance

Date: 10/7/2010

Versata FZ LLC

By: R. Subramaniam

Name: Rahul Subramaniam

Title: Manager

Date: 10/7/2010

**EXHIBIT 5.1**

**Royalty Schedule**

Pursuant to Section 5.1 of this Agreement, Licensee shall pay to Licensor the following royalties for the Products:

| Product | Total NPV | Payments | | |
|---|---|---|---|---|
| | | Oct 1, 2010 | Nov 1, 2010 | Dec 1, 2010 |
| Think3, Inc | $3,000,000 | $1,000,000 | $1,000,000 | $1,000,000 |

# $\mathscr{F}$erri
## &
# $\mathscr{A}$ssociati

**ANDREA FERRI**
*Dottore Commercialista*
*studio@studioferri.it*
**ROMANA FARISELLI**
*Dottore Commercialista*
*rfariselli@studioferri.it*

**ANTONELLA FRATALOCCHI**
*Dottore Commercialista*
*afratalocchi@studioferri.it*
**CRISTINA GALVANI**
*Dottore Commercialista*
*cgalvani@studioferri.it*
**STEFANIA MARCHESINI**
*Dottore in Economia e Professione*
*smarchesini@studioferri.it*
**MARIA OLIVIA ZAMBELLI**
*Avvocato*
*mozambelli@studioferri.it*

Studio Dottori Commercialisti,
Avvocati e Revisori contabili

Fax +971( )4489297

Spett.le
VERSATA FZ-LLC
707-708 Dubai Media City
PO BOX 502092 Dubai
Emirati Arabi Uniti

Bologna, 2 May 2011

Dear Sirs,

I write to you in my quality of trustee and representative of Think 3 Inc, Italian Branch, with registered office in Casalecchio di Reno (Bologna), Via Camillo Ronzani n.7/29 (the "**Company**"), declared bankrupt by means of the Judgement no. 69/11 of 14.4.2011 of the Court of Bologna, in order to terminate on behalf of the Company - pursuant to Section 72 of the Italian Royal Decree no. 267 of 16 March 1942 - the license agreement entered into on 7.10.2010 with your company (the "**License Agreement**").

Such termination is effective as of the date hereof. Therefore, any use, disclosure, dissemination or sub-license of (a) the Company's intellectual property rights described in the License Agreement, as well as (b) any related trademark, is strictly prohibited and will be prosecuted. In particular, you are hereby requested to immediatly cease and desist from displaying the Company's trademark on your website.

In addition, you are requested to return immediately (in any case not later than 5 days from the date hereof), and permanently delete from your IT systems, any and all documents in any form (including electronic documents and files) embodying and/or anyhow related to the above-mentioned intellectual property rights, to the following address: Via D'Azeglio n. 19, 40123 Bologna.

Yours faithfully.

The Trustee of Think3 inc
Dott. Andrea Ferri

Via D'Azeglio, 19 - 40123 Bologna
Tel. 0039 051 270321 r.a. – Fax 0039 051 270313
www.studioferri.it
e-mail segreteria studio@studioferri.it

JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

## DEFENDANTS

**(b)**  County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff

(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury  - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893  Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☐ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
another district
(specify)

☐ 6   Multidistrict
Litigation

☐ 7   Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):

Brief description of cause:

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☐ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.    Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.**  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**.    Example:    U.S. Civil Statute: 47 USC 553
                                                                        Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.**  This section of the JS 44 is used to reference related pending cases if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.