

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: September 12, 2011.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| THINK3 INC., | § | Case No. 11-11252 |
| | § | |
| Debtor. | § | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER APPROVING DEBTOR'S MOTION TO (I) APPROVE COMPROMISE AND SETTLEMENT OF CLAIMS BY AND BETWEEN THINK3 INC., VERSATA FZ-LLC, VERSATA DEVELOPMENT GROUP, INC., AND VERSATA SOFTWARE, INC., (II) ASSUME TECHNOLOGY LICENSE AGREEMENT, AND (III) APPROVE SALE OF CERTAIN INTELLECTUAL PROPERTY INTERESTS TO VERSATA FZ-LLC**
**[DKT. NO. 81]**

WHEREAS think3 Inc., debtor and debtor-in-possession in the above-referenced chapter 11 case (the "Debtor" or "Think3"), filed the *Debtor's Motion to (I) Approve Compromise and Settlement of Claims By and Between Think3 Inc., Versata FZ-LLC, Versata Development Group, Inc., and Versata Software, Inc., (II) Assume Technology License Agreement, and (III) Approve Sale of Certain Intellectual Property Interests to Versata FZ-LLC* [Dkt. No. 81] (the "Settlement Motion"); and

WHEREAS the Court held a full evidentiary hearing on September 8 and 9, 2011 (the "Settlement Hearing") on the Settlement Motion; and

NOW, THEREFORE, based upon the Court's consideration of the Settlement Motion and all objections and responses thereto having been withdrawn, resolved, or otherwise overruled as set forth herein; and upon the arguments of counsel and the evidence adduced at the Settlement Hearing; and the Court having found the Settlement Motion should be granted as reflected by the Court's rulings made herein and at the Settlement Hearing; and after due deliberation and sufficient cause appearing therefor, the Court hereby **FINDS, DETERMINES, AND CONCLUDES** that:

## I.
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.     The findings and conclusions set forth herein and in the record of the Settlement Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     The Court has jurisdiction over the Debtor's chapter 11 case pursuant to 28 U.S.C. § 1334.  Approval of the proposed settlement agreement between the Debtor and Versata FZ-LLC ("Versata"), Versata Development Group, Inc. ("VDG"), Versata Software, Inc. ("VSI"), and Gensym Cayman L.P. (the "Settlement Agreement")[1] is a core proceeding pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to enter a final order with respect thereto.

---

[1] Capitalized terms used herein but not otherwise defined have the meanings given them in the Settlement Agreement.

The Debtor is an eligible debtor under section 109 of title 11 of the United States Code (the "Bankruptcy Code"). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

C.      On May 18, 2011, the Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is authorized to continue to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Case.

D.      The Court takes judicial notice of the docket of the Chapter 11 Case maintained by the Clerk of the Court, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Case.

E.      The Debtor has the burden of proving that the Settlement Agreement should be approved under Bankruptcy Rule 9019 by a preponderance of the evidence. The Debtor has met such burden.

F.      The terms and conditions of the Settlement Agreement were negotiated, proposed, and agreed to by the parties in good faith (within the meaning of Bankruptcy Code section 363(m)), and from arm's-length bargaining positions.

(1)      The proposed settlement is fair and equitable, for sufficient and reasonably equivalent consideration, in the best interest of the Debtor's creditors, wherever located, and consistent with applicable U.S. law.

(2)      The probabilities of success, the complexity, expense, and likely duration of litigating the claims at issue, and all other factors relevant to a full and fair assessment of the wisdom of the proposed settlement and support approval of the Settlement Agreement.

(3)     The Debtor has demonstrated both (i) good, sufficient, and sound business purpose and justification, and (ii) compelling circumstances for the prompt sale of the assets contemplated under the Settlement Agreement pursuant to Bankruptcy Code section 363(f).

(4)     Time is of the essence as to approval and consummation of the transactions sought by the settlement.

(5)     The Settlement Agreement provides several benefits to the Debtor's Chapter 11 estate, including:

> (a)     granting the Debtor's Chapter 11 estate the right to use in the China market all of Versata's improvements to the CAD Products, which will allow the Chapter 11 estate to receive all of the benefit of Versata's continued research and development of its CAD Products in the China market not currently available to the Debtor without the risk of patent infringement liability and without any cost to the Chapter 11 estate;

> (b)     granting the Debtor's Chapter 11 estate the right to use and sell certain TD PLM Products;

> (c)     allowing the Chapter 11 estate to generate revenue through the sale of CAD Products in China, which can be used to satisfy the claims of creditors;

> (d)     allowing the Chapter 11 estate to use VDG and VSI's TD PLM Products anywhere in the world and a license to conduct research and development of CAD Products in the China market without the risk of patent infringement liability; and

(e) providing financial benefits in the form of a settlement payment in the amount of $250,000, an increase in the commitment amount under the DIP Loan Agreement from $1,050,000 to $2,300,000, and an option for the Chapter 11 estate to terminate the Licensee TD PLM License (as such term is defined in the Technology License Agreement between the Debtor and Versata (the "<u>License Agreement</u>")) in full satisfaction of the obligations under the DIP Loan Agreement.

(6)     The Debtor and customers of think3 products are exposed to potential infringement claims by VDG and VSI as to the Related Party Patents.

(7)     The Settlement Agreement resolves the claims against the Chapter 11 estate asserted in two lawsuits filed against the Debtor: (1) *Versata FZ-LLC v. Think3 Inc.,* Civil Action No. 1:11-cv-404 in the United States District Court for the Western District of Texas, Austin Division and (2) *Versata Development Group, Inc., Versata Software, Inc., Versata FZ-LLC, and Gensym Cayman, L.P. v. Think3 Inc., Andrea Ferri, and the Italian Estate of Think3 Inc.,* Adversary Case No. 11-01221 in this Court. For the avoidance of doubt, the Settlement Agreement does not release any claims against the Italian Trustee, any Italian Trustee Allies, or any other matters carved out of the release in the Settlement Agreement. Absent this settlement, such litigation would result in substantial expense and claim exposure to the Debtor's Chapter 11 bankruptcy estate.

(8)     The Debtor's decision to assume the License Agreement, as amended under the Settlement Agreement, represents a sound exercise of the Debtor's business judgment. The assumption of the amended License Agreement pursuant to the Settlement Agreement is in the best interest of the Debtor's creditors and other parties in interest.

(9)     If the Debtor were to reject the License Agreement, or if the Italian Trustee's termination under Italian law were permitted to result in the rejection of the License Agreement under applicable U.S. bankruptcy law, Versata nevertheless would be entitled to exercise its rights as licensee under section 365(n) of the Bankruptcy Code.

(10)    The consideration under the Settlement Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law.

(11)    Neither Versata nor any other party to the Settlement Agreement shall be deemed, as a result of any action taken in connection with the Settlement Agreement, to: (1) be a successor (or other such similarly situated party) to the Debtor; (2) have, de facto or otherwise, merged with or into the Debtor; (3) be a mere continuation of the Debtor or its estate (and there is no continuity of enterprise between Versata and the Debtor); or (4) be holding itself out to the public as a continuation of the Debtor.

(12)    The requirements of sections 363(b), 363(f), and 365 of the Bankruptcy Code and any other applicable law relating to the sale of the assets under by the Settlement Agreement have been satisfied.

G.     (1)     Any transfer of property of the Debtor's Chapter 11 bankruptcy estate pursuant to the Settlement Agreement constitutes a legal, valid, and effective transfer, free and clear of all liens, claims, adverse interests and encumbrances in accordance with Bankruptcy Code section 363(f), and any allowed claims shall attach to the Debtor's proceeds of the settlement.

(2)     All of the Debtor's property, including any property that is subject to the Settlement Agreement, is property of the Debtor's Chapter 11 bankruptcy estate pursuant to

Bankruptcy Code section 541 and protected by section 1529(1) of the Bankruptcy Code and other applicable U.S. law.

(3)     The location of the Debtor's intellectual property, customer contracts, and accounts receivable is in Austin, Texas.

H.     (1)     Any order entered by this Court in connection with the Chapter 11 Case shall apply to all property of the Debtor and all custodians, creditors, and other parties in interest wherever located pursuant to 28 U.S.C. § 1334(e)(1).

(2)     The Debtor made a turnover demand on the Italian Trustee in accordance with section 543 of the Bankruptcy Code as to which the Italian Trustee has refused to respond.

I.     (1)     Pursuant to the License Agreement and as reaffirmed by the Settlement Agreement, Versata is the exclusive owner worldwide (excluding only China) of all right, title and interest in and to all of the Intellectual Property (as such term is defined in the License Agreement).

(a)     These intellectual property rights include the rights to both (i) the Think3 software code exclusively licensed to Versata, as a "transfer of ownership of the copyright" in accordance with sections 101 and 201 of the United States Copyright Act (the "Copyright Act") and (ii) all enhancements, modifications, and derivate works of such software code, which constitute separate copyrights owned by Versata as their author under sections 103 and 106 of the Copyright Act.

(b)     The intellectual property further includes all other Think3-related intellectual property, including, but not limited to, the Think3

product trademarks, trade names, service marks, logos, naming rights, and domain name.

(2)     The License Agreement does not merely convey a license to Versata to use the above-mentioned intellectual property, but it is a full and completed sale and transfer of the above-mentioned intellectual property to Versata worldwide (excluding only China).

(a)     The exclusive license granted with respect to copyrights and related rights under the License Agreement in connection with the Debtor's software products constituted a "transfer of copyright ownership" as provided in sections 101 and 201(d) of the Copyright Act.

(b)     Because the exclusive license granted under the License Agreement has been substantially performed by both parties and fully performed by Versata, as licensee, the transfer of the exclusive rights thereunder has been completed, is not an executory contract, and cannot be rejected under section 365(a) of the Bankruptcy Code.

(c)     The License Agreement is valid, binding and enforceable and is in full force and effect and has never been revoked.

(d)     Versata has fully performed all of its obligations under the License Agreement, including all payment obligations, and there has been no breach or unsatisfied condition on the part of Versata.

(e)     The transfers of property under the License Agreement were fully vested, accomplished and consummated.

(3)     All of the Debtor's contracts, intellectual property and other intangible assets, including the intellectual property that is the subject of the License Agreement, is located in Austin, Texas, at the Debtor's headquarters and constitutes property of the Debtor's Chapter 11 bankruptcy estate pursuant to section 541 of the Bankruptcy Code.

J.     (1)     The License Agreement and related transactions with the Debtor were valid, fair, equitable, at fair market value, and on arm's-length terms as to all parties to the License Agreement and related transactions, providing reasonably equivalent value to the Debtor at the time of the transaction.

(2)     Versata properly paid to Think3 $3 million under the License Agreement for the above-mentioned intellectual property.

(a)     The payments made by Versata for the intellectual property were all valid and proper payments and constituted valid and proper and fully adequate consideration for the intellectual property.

(b)     The consideration paid was used to satisfy valid and proper claims against Think3.

(c)     Payments made through the bank account of Think3 SRL, the Debtor's subsidiary, were proper payments to the Debtor. Such subsidiary was authorized by the Debtor to receive payments for the account of the Debtor from Versata and others. All funds paid by Versata to such subsidiary were used to pay employees and other creditors of the Debtor that had been approved for payment by the Debtor.

K.      All improvements made by Versata to the Think3 software products and copyright code are derivative copyrights owned by Versata, and, as such, exist independent of the Technology License Agreement.

L.      (1)      All contracts made or novated by Versata with any customer, supplier or other counter-party, whether assigned from the Debtor or made with Versata at its inception, belong to Versata independent of the License Agreement and any right of the Italian Trustee to purport to terminate them.

(2)      Versata is a separate and independent legal entity, properly incorporated under the laws of the UAE.

M.      No license exists for the use of Think3 products that the Settling Creditors have asserted are being infringed.

N.      This Court has considered the terms of the Settlement Agreement, including the releases contained therein.  As part of such consideration, this Court finds as follows:

(1)      There is no evidence of bad faith or collusion in connection with the negotiation of the terms of the License Agreement on behalf of the counterparties thereto or their officers or agents.

(2)      Negotiations of the terms of the License Agreement were conducted at arm's length and in good faith.  There is no evidence of any intent by Versata or the Debtor to defraud shareholders or employees of the Debtor in connection with the License Agreement. The License Agreement transaction had a legitimate business purpose.

(3)      There is no evidence of any material non-disclosure or misrepresentations by Versata or the Debtor in connection with the negotiation of the License Agreement.

O.      (1)      All actions taken by the independent and Court-approved CRO, including, without limitation, entering into the Settlement Agreement on behalf of the Debtor, have been in

good faith and accordance with U.S. law, have been an exercise of the Debtor's business judgment, and are in the best interest of the Debtor's Chapter 11 bankruptcy estate and creditors.

(2)     The CRO has acted fairly and has made reasonable efforts to cooperate with the Italian Trustee.

(3)     Notice of the Settlement Hearing was appropriate and satisfactory and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  At all times since the Chapter 11 filing, the Italian Trustee had adequate notice and actual and constructive knowledge of all events in this Chapter 11 Case, having previously appeared in this case and having been represented by competent counsel.

P.     This Court has *in rem* jurisdiction over all assets of Think3, wherever located, pursuant to 28 U.S.C. § 1334(e)(1).

Q.     Based on the foregoing, the Settlement Agreement satisfies the standards for approval of a compromise under Bankruptcy Rule 9019 and complies with the applicable provisions of 11 U.S.C. §§ 363 and 365.

## II.
## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein.

2.     The Settlement Agreement, attached hereto as <u>Exhibit A</u>, is hereby approved under Bankruptcy Rule 9019.  The Debtor, Versata, and all other parties to the Settlement Agreement are authorized and ordered to take all actions necessary to effectuate the terms of the Settlement Agreement.

3.      Upon occurrence of the Effective Date of the Settlement Agreement, the Debtor shall file and serve a notice that the Effective Date has occurred.

4.      Except as provided herein, all objections, responses, statements and comments, if any, in opposition to the Settlement Motion, other than those withdrawn with prejudice, waived, or settled prior to, or on the record at, the Settlement Hearing, shall be, and hereby are, overruled in their entirety.

5.      The provisions of the Settlement Agreement, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

6.      Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Settlement Agreement.

7.      This Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Settlement Agreement, any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Settlement Agreement.

8.      The stay of this Order provided by any Bankruptcy Rule (including, without limitation, Bankruptcy Rule 6004(h)), whether for fourteen (14) days or otherwise, is hereby waived, and this Order shall be effective and enforceable immediately upon its entry by the Court.

9.      The Court retains jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order, and adjudicate, if necessary, any and all disputes

involving the Debtor or any parties having appeared before this Court related in any way to, or affecting, the Settlement Agreement.

## **Exhibit A**

Settlement Agreement

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (this "<u>Agreement</u>") is entered into as of the ____ day of September, 2011, by and among think3 Inc., a Delaware corporation and Chapter 11 debtor-in-possession (the "<u>Debtor</u>"), Versata FZ-LLC, a company organized and existing under the Dubai Technology and Media Free Zone ("<u>Versata</u>"), Versata Development Group, Inc. (formerly known as Trilogy Development Group, Inc.), a Delaware corporation ("<u>VDG</u>"), Versata Software, Inc., a Delaware corporation ("<u>VSI</u>"), and Gensym Cayman L.P., a Cayman Islands exempted limited partnership ("<u>Gensym</u>") (each a "<u>Party</u>" and collectively, the "<u>Parties</u>").  Capitalized terms used herein are defined as set forth in Section 1 below, unless otherwise specified.

### Recitals

A.     The Debtor was incorporated under the laws of Delaware on June 21, 2000.  On September 27, 2010, the Debtor was acquired by ESW of Austin, Texas.  On October 7, 2010, the Debtor and Versata entered into the Versata License Agreement.  Under the Versata License Agreement, the Debtor granted Versata the exclusive right to use its intellectual property (other than in China) in the design, development, manufacture, marketing, distribution, and support of products.  In exchange, Versata paid the Debtor $3,000,000.  The Versata License Agreement is governed by Texas law, and the transactions contemplated thereunder were completed and fully performed before March 14, 2011.

B.     On March 14, 2011, several creditors commenced an insolvency proceeding against the Debtor and its Italian subsidiary in the Italian Court.  The Italian Court appointed the Italian Trustee as trustee for the Debtor to the extent of its jurisdiction.  The Italian Trustee has seized (or attempted to seize) control of the Debtor's assets and property around the world, and he has not provided the Debtor access to its property in Italy or elsewhere in his control, including access to the records that are relevant to the claims and disputes affecting the Italian Trustee.

C.     Following his appointment, the Italian Trustee in the Italian Court purported to terminate the Versata License Agreement, and Versata challenged his authority to terminate it.  On May 2, 2011, the Italian Court authorized the purported termination.  Versata has appealed the Italian Court's ruling.  The Italian Trustee's actions have caused considerable confusion among customers of think3 Products.  Versata filed the Versata Lawsuit against the Debtor for breach of the Versata License Agreement, tortious interference, and declaratory relief in the United States District Court for the Western District of Texas, Austin Division.

D.     On May 18, 2011, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Debtor is a debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code in the Bankruptcy Case.  On May 18, 2011, the Debtor appointed Rebecca A. Roof as its President, Secretary, and Chief Restructuring Officer (the "<u>CRO</u>").  The Bankruptcy Court approved the appointment by its order entered on May 24, 2011.

1

E.      On May 19, 2011, the CRO sent a letter to the Italian Trustee requesting that the Italian Trustee, as a custodian of property of the Debtor's estate under Section 543 of the Bankruptcy Code, turn over any of the Debtor's property currently in his possession, custody, or control and file an accounting with the Bankruptcy Court.  The Italian Trustee has not yet complied with Section 543 of the Bankruptcy Code by turning over the Debtor's property to the Debtor.

F.      Prior to the Effective Date, VDG granted an exclusive license to VSI under the Related Party Patents.  VDG contends that certain of the Related Party Patents are being infringed upon by the Italian Trustee and his Italian Estate, among other Italian Trustee Allies.  On August 17, 2011, VDG, VSI, Versata, and Gensym filed the Patent Lawsuit against the Debtor, the Italian Trustee, and the Italian Estate seeking declaratory relief, preliminary and permanent injunctive relief, equitable subordination, and damages to remedy tortious interference with contractual relations, tortious interference with prospective business advantage and prospective contract, breach of contract, and patent infringement.

G.      There are numerous disputes between the Italian Trustee, Versata, and the Debtor.  Versata has certain common interests with the Debtor.  The Debtor believes the Bankruptcy Case is the main bankruptcy proceeding and thus the proper forum for control of all global assets of think3 Inc., with, at most, limited rights for the Italian Trustee as to the tangible assets properly sited in Italy.

H.      Versata and the Allied U.S. IP Parties contend that the Italian Former Employee Defendants created the financial and other problems for think3 Inc. prior to the Merger with ESW.  Versata and the Allied U.S. IP Parties assert that the Italian Trustee is taking actions that have harmed and continue to harm the business and assets of the Debtor, as well as Versata and other Allied U.S. IP Parties.  Such adverse actions alarm and confuse customers of think3 Products and damage the think3 brand.  The Parties agree that the Debtor and its estate would benefit from avoiding involvement in such disputes, particularly given that the Parties expect such disputes to escalate further as the Allied U.S. IP Parties act outside of Italy to protect their rights against the Italian Trustee and his allies.

I.      Because the Italian Trustee has failed to comply with Section 543 of the Bankruptcy Code, the value of the Debtor's business declines and customers of think3 Products flee from the uncertainties and problems created by the Italian Trustee.  Versata has offered a solution to the Debtor's Chapter 11 Estate that would empower the Debtor's Chapter 11 Estate to avoid involvement in the various ongoing disputes and to receive substantial benefits, in exchange for which Versata would receive a degree of peace for itself and its customers and a reservation for the Allied U.S. IP Parties of rights, claims and defenses against the Italian Trustee and the Italian Trustee Allies.  The Parties intend that this Agreement will provide the Debtor with more tools to find more solutions to the disputes with the Italian Trustee than presently appear otherwise available.

J.      The Parties intend for the Debtor's Chapter 11 Estate to benefit from the success of Versata, because the Debtor's Chapter 11 Estate can receive the benefit of upgrade investments in marketing and product development to use in the China market.  The customer service and other benefits available from Versata to the Debtor's Chapter 11 Estate allow the

Chapter 11 Estate to achieve revenue (or to sell assets to a buyer who can use those benefits). The net benefits for the Debtor from this settlement provide substantial benefit to the Chapter 11 Estate without any meaningful expense. The alternative of a disputed rejection of the Versata License Agreement under 11 U.S.C. § 365 leaves the Debtor's Chapter 11 Estate at best with continuing license rights by Versata under 11 U.S.C. § 365(n), and otherwise, while increasing claims against the Debtor from both Versata and all of its customers and suppliers and the Related Party Patent Holders. In the absence of such a settlement, there also is no reason to expect any buyer of assets to pay anything (i) for the right to compete with the Italian Trustee and its buyer, (ii) for the burden of competing with Versata using, among other things, its § 365(n) retained license rights and its derivative copyright works, and (iii) for the burden of litigating over the infringement of the Related Party Patents.

K.    The Parties intend to settle certain disputes relating to intellectual property and related rights and ownership interests of Versata in a manner that, subject to the Italian Carve-Out and the Allied U.S. IP Party Reservations, (i) empowers the Debtor to afford a reasonable Chapter 11 plan of reorganization and to repay or otherwise satisfy the DIP Loan Agreement debt and other administrative claims, including at its option to use certain assets (including the Licensee Cross-License reacquired by the Debtor in this settlement); (ii) enables Versata and the Debtor to collaborate on common interests to serve customers of think3 Products in a manner that reduces adverse customer claims and salvage value for both Versata and the Debtor in their respective markets; (iii) enables the Debtor's Management to exploit its China market opportunities using Versata IP and service capabilities as well as the Related Party Patents; (iv) enables the Debtor to reacquire the TD PLM technology and certain intellectual property previously licensed to Versata under the Versata License Agreement in order to attract greater interest from buyers and investors, as well as potentially to have more tools to induce cooperation from the Italian Trustee; (v) enables the Debtor's Chapter 11 Estate to mitigate potential liability and other adverse consequences to the Debtor in connection with the various disputes between the Italian Trustee and the Allied U.S. IP Parties, thereby improving the results for the Debtor's global creditors and customers of think3 Products; and (vi) empowers the Debtor's Chapter 11 Estate with the tools, such as the Licensee Cross-License and the Related Party License, that may facilitate (subject to the Italian Carve-Out rights of the Allied U.S. IP Parties) an effective reorganization.

L.    This settlement provides benefits for all global creditors, including Italian creditors. Therefore, this Agreement is in the best interest of the Debtor's creditors and the Chapter 11 Estate. Moreover, since the Parties intend that the Debtor's Chapter 11 Estate shall be entitled to benefits without the obligation to defend or enforce for Versata the terms of this Agreement after it is approved, and because Versata has agreed to assume the burden of enforcing its own rights and benefits hereunder against the Italian Trustee and Italian Estate, unless and until the Italian Trustee joins in the settlement, the benefits for creditors are net of expenses.

M.    Because of the burden on Versata to enforce and defend its rights and defenses against the Italian Trustee and Italian Estate, the Parties agree that it is necessary for the Debtor to use the Italian Carve-Out and Allied U.S. IP Party Reservations, so that it can so enforce and defend itself as the Chapter 11 Estate. The Parties agree that the Debtor shall benefit from such defense efforts by Versata and its allies.

N.     The Bankruptcy Case is the main bankruptcy proceeding for the Debtor, and the Italian Trustee's actions are inconsistent with the Debtor's rights under the Bankruptcy Code. The Parties believe that an agreement between Versata, the Debtor, VDG and VSI benefits all Parties.

**Agreement**

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Certain Defined Terms.**

The following terms shall have the meanings set forth below as used in this Agreement:

(a)     "Allied U.S. IP Parties" means, collectively, any or all of Versata, VDG, VSI, ESW and other affiliates designated from time to time by Versata.

(b)     "Allied U.S. IP Party Reservations" means a comprehensive reservation of any and all interests, defenses, claims, causes of action, remedies and other rights of each Allied U.S. IP Party against (i) the Italian Trustee, (ii) the Italian Estate, (iii) the Italian Trustee Allies (including the Italian Former Employee Defendants), and (iv) the Debtor (solely to the extent acting other than at the direction of the Debtor's Management), any successor or assign of the Debtor that is not approved by both Versata and the Bankruptcy Court, and any and all claims arising out of or in connection with the Italian Estate.  Such reservation shall include, without limitation, any and all rights, powers and defenses under 11 U.S.C. § 1529(1) and otherwise with respect to the Bankruptcy Case, which predates any Chapter 15 filing, as well as the rights, remedies and defenses of parties in interest in the Bankruptcy Case to resist any recognition for any Chapter 15 case by any foreign representative, including the Italian Trustee, and, if and to the extent that any recognition is granted in any Chapter 15 filing, to limit such recognition to the maximum extent possible as a foreign non-main proceeding.  The intent of this provision is that the Debtor shall achieve certain rights and benefits under this Agreement from Versata, VDG and VSI (but not from any of the other Allied U.S. IP Parties), which rights and benefits are subject to the Italian Carve-Out and the Allied U.S. IP Party Reservations.  In the event of any conflict between this Agreement and the Italian Carve-Out or Allied U.S. IP Party Reservations, the Italian Carve-Out and Allied U.S. IP Party Reservation shall be preserved as paramount and controlling and the Agreement shall be subordinate thereto.

(c)     "Amended Versata License Agreement" means the Versata License Agreement, as amended by this Agreement.

(d)     "Bankruptcy Case" means Case No. 11-11252 currently pending in the Bankruptcy Court.

(e)     "Bankruptcy Code" means Title 11 of the United States Code.

(f)     "Bankruptcy Court" means the United States Bankruptcy Court for the Western District of Texas, Austin Division.

(g)    "CAD" or "CAD Product" means the "CAD" product described in Exhibit A hereto, which product expressly excludes the Reserved PLM (including in such exclusion any portion of the Reserved PLM that is or may be incorporated into any "CAD" product).

(h)    "Chapter 11 Estate" means the maximum possible estate created by the Debtor's Bankruptcy Case in the Bankruptcy Court, exclusive of the Italian Estate or the estate of any foreign proceeding (to the extent that it is not, or contends that it is not, subordinate to the Chapter 11 Estate pursuant to 11 U.S.C. § 1529(1)), and all property of the estate thereof under 11 U.S.C. § 541 that is not located or alleged to be located in another country that claims control of such property in a foreign proceeding.  For avoidance of doubt, the intent of this definition is to allow maximum scope to the Chapter 11 Estate without in any way allowing adversaries of the Chapter 11 Estate, Versata, or other Allied U.S. IP Parties to claim any benefits under this Agreement or from the Chapter 11 Estate at the same time as such adversaries dispute the rights of the Chapter 11 Estate and its creditors to receive the full protections of Chapter 11 of Title 11 of the United States Code.

(i)    "Customer Support Agreement" means an agreement providing for the support of customers of think3 Products in form and substance agreed upon by the Debtor and Versata.

(j)    "Debtor's Management" means (i) the CRO or (ii) any successor responsible officer, Chapter 11 Trustee or Liquidating Trustee under any Chapter 11 plan of reorganization supported by Versata (in each case) for the Debtor, if and to the extent such managers are approved in writing by Versata as reasonable and neutral fiduciaries of the Debtor who can be relied upon to protect the Debtor in the best interests of U.S. and global parties in interest and who accept and are ready, willing and able to perform this Agreement in accordance with its express terms.  The reason for such division between Debtor's Management and other types of representatives of the Debtor is to clarify when Versata and "Allied U.S. IP Parties" would forbear from exercising certain rights and remedies versus when they would be free to exercise or enforce any and all rights and remedies against adversary representatives of the Debtor.  The Italian Trustee, the Italian Former Employee Defendants, the other Italian Trustee Allies, and anyone else supported by any of the Italian Trustee Allies, cannot serve as Debtor's Management for the purposes of this Agreement.

(k)    "DIP Loan Agreement" means that certain Debtor-in-Possession Loan and Security Agreement, dated as of May 18, 2011, by and between the Debtor and Gensym and approved by the Bankruptcy Court.

(l)    "ESW" means ESW Capital, LLC, a Delaware limited liability company and for the purposes of this Agreement an "Allied U.S. IP Party."

(m)    "IP" means intellectual property, including, without limitation, the following:

(i)    all patents and patent applications, domestic or foreign, all licenses relating to any of the foregoing and all income and royalties with respect to any licenses, all rights to sue for past, present or future infringement thereof, all rights arising therefrom and pertaining thereto and all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof;

(ii)    all copyrights and applications for copyright, domestic or foreign, together with the underlying works of authorship (including titles), whether or not the underlying works of authorship have been published and whether said copyrights are statutory or arise under the common law, and all other rights and works of authorship, all computer programs, computer databases, computer program flow diagrams, source codes, object codes and all tangible property embodying or incorporating any copyrights, all licenses relating to any of the foregoing and all income and royalties with respect to any licenses, and all other rights, claims and demands in any way relating to any such copyrights or works, including royalties and rights to sue for past, present or future infringement, and all rights of renewal and extension of copyright;

(iii)    all state (including common law), federal and foreign trademarks, service marks and trade names, and applications for registration of such trademarks, service marks and trade names, all licenses relating to any of the foregoing and all income and royalties with respect to any licenses, whether registered or unregistered and wherever registered, all rights to sue for past, present or future infringement or unconsented use thereof, all rights arising therefrom and pertaining thereto and all reissues, extensions and renewals thereof;

(iv)    all trade secrets, trade dress, trade styles, logos, other source of business identifiers, mask-works, mask-work registrations, mask-work applications, software, confidential and proprietary information, customer lists, license rights, advertising materials, operating manuals, methods, processes, know-how, algorithms, formulae, databases, quality control procedures, product, service and technical specifications, operating, production and quality control manuals, sales literature, drawings, specifications, blue prints, descriptions, inventions, name plates, catalogs, internet websites, and internet domain names and associated URL addresses;

(v)    the entire goodwill of or associated with the businesses now or hereafter conducted by Versata or the Debtor connected with and symbolized by any of the aforementioned properties and assets; and

(vi)    all accounts, payment intangibles, commercial tort claims and other rights to payment, all other proprietary rights or other intellectual or other similar property, and all other general intangibles associated with or arising out of any of the aforementioned properties and assets and not otherwise described above, and all proceeds of any IP.

(n)    "Italian Carve-Out" means collectively a comprehensive reservation of any and all of the interests, defenses, claims, causes of action, remedies and other rights available to Versata or any other Allied U.S. IP Parties, whether directly or indirectly, in any court of competent jurisdiction anywhere in the world or otherwise under any applicable law throughout the world against (i) the Italian Trustee or the Italian Estate, as well as the Italian Former Employee Defendants, (ii) any other foreign representative of any other foreign proceeding, including any Italian Trustee Allies, or (iii) any Chapter 11 trustee or any estate representative of the Debtor who does not serve as Debtor's Management, including in each case (i), (ii) or (iii) as to any attempt (whether or not successful or disputed) by the Italian Trustee or any other representative to seek recognition under Chapter 15 or to exercise any rights under Chapter 15, if recognized, or otherwise to act contrary to the Bankruptcy Code in the Italian Court or elsewhere (ignoring for such test, and without regard to, any deferral to any law besides applicable Texas

law and the Bankruptcy Code without extraterritorial application in the U.S. or as to the Debtor of any foreign law).

The purpose of the Italian Carve-Out is to document the maximum reservation of all interests, defenses, claims, causes of action, remedies and other rights of Versata and Allied U.S. IP Parties against the Italian Trustee and Italian Estate, as well as against other Italian Trustee Allies and anyone else who may be a representative of the Debtor but is not Debtor's Management.  On the other hand, the Agreement creates the opportunity for cooperation and collaboration with Debtor's Management and customers of think3 Products; such an opportunity is in the best interest of global creditors participating in the Bankruptcy Case, and provides for the least possible interference from any Chapter 15 case, as contemplated by 11 U.S.C. § 1529(1).

(o)     "Italian Court" means any applicable court of competent jurisdiction in Italy exercising jurisdiction over any of the Italian Estate or any related disputes with the Italian Trustee in Italy, including the court of Hon. Manuela Velotti referenced in the definition of the Italian Estate.

(p)     "Italian Estate" means the proceeding pending in the Court of Bologna, Italy as IV Division Bankruptcy Case No. 69/2011 as to the Italian branch of the Debtor, including the tangible property physically located in Italy at the time such case was filed.

(q)     "Italian Former Employee Defendants" means collectively Filippo Zucarello, any and all of the other former officers, directors, managers, employees, agents of the Italian branch of the Debtor prior to the Merger with ESW, whether or not they continued with the Debtor, its Italian branch, or Italian subsidiary think3 SRL thereafter, and who are alleged by ESW or Versata to be culpable for any wrongdoing that either has harmed the Debtor or its Italian branch or the Italian Estate, or that induced or aided and abetted by misrepresentations or incorrect books, records or other misrepresentation the Merger with ESW or the Versata License Agreement or related transactions.  For the avoidance of doubt, the Italian Former Employee Defendants, include, without limitation, those former managers in Italy who are reported to be assisting the Italian Trustee (which actions are violating the automatic stay under 11 U.S.C. § 362 and otherwise harming the business of the Chapter 11 Estate).

(r)     "Italian Trustee" means Dr. Andrea Ferri and his successors in his capacity as the bankruptcy trustee of the Italian Estate and as the disputed foreign representative of the Italian Estate in the event he seeks recognition in the U.S. or in other jurisdictions.

(s)     "Italian Trustee Allies" means any Italian Former Employee Defendants, any other "foreign representatives" of any other "foreign proceedings" involving the Debtor or any of its subsidiaries (as such terms are defined in the Bankruptcy Code), the Italian Estate, or any other foreign proceeding estate who are not approved in writing by Versata.

(t)     "Licensee Cross-License" means, collectively, the Licensee CAD License and the Licensee TD PLM License from Versata to the Debtor as set forth in Section 2.4 and Section 2.5 of the Amended Versata License Agreement.

(u)     "Merger" means the merger of the "Oldco" think3 Inc. with and into a subsidiary of ESW pursuant to an Agreement and Plan of Merger dated as of September 28, 2010 among think3 Inc., HSCI, Inc. and ESW.

(v)     "Original Versata License Agreement" means the Versata License Agreement prior to amendment by this Agreement.

(w)     "Patent Lawsuit" means the lawsuit filed by VDG, VSI, Versata, and Gensym in the Bankruptcy Court, in the adversary proceeding styled and numbered *Versata Development Group, Inc., Versata Software, Inc., Versata FZ-LLC, and Gensym Cayman, L.P. v. Think3 Inc., Andrea Ferri, and the Italian Estate of think3 Inc.*, Adversary Proceeding Number 11-01221.

(x)     "Related Contracts" means the Licensee Cross-License, the Related Party License, and the other agreements required to be executed by the Parties pursuant to this Agreement.

(y)     "Related Party Conditions" shall mean the following: (a) this Agreement and the Related Contracts remain in full force and effect; (b) the Debtor, or its authorized successors and assignees, continues to perform its obligations under this Agreement and the Related Contracts for Versata, VDG and VSI (as the case may be); (c) each of Versata, VDG and VSI continues to receive the full benefit of its bargain thereunder; (d) the Debtor is and remains (i) a debtor-in-possession in the Bankruptcy Case under the control of Debtor's Management or (ii) an entity under the control of a successor or assignee of the Debtor approved in writing by Versata, VDG and VSI and by the Bankruptcy Court; and (e) the action(s) for which the Debtor claims to be licensed pursuant to the rights and licenses granted in this Agreement is/are taken at the express direction of Debtor's Management or such an approved successor or assignee.

(z)     "Related Party License" means, collectively, the Related Party TD PLM License and the Related Party Research and Development License from VDG and VSI to the Debtor as set forth in Section 3(a) and Section 3(b) below.

(aa)     "Related Party Listed Patents" means the issued patents listed in Exhibit B hereto.

(bb)     "Related Party Patent Holders" means VDG (the owner of the Related Party Patents) and VSI (the exclusive licensee of the Related Party Patents), each of whom is for the purpose of this Agreement one of the "Allied U.S. IP Parties."

(cc)     "Related Party Patents" means (i) the Related Party Listed Patents; (ii) any continuations, continuations in part, divisionals, reissues, reexaminations, substitutions, extensions, validations, additions and the like of the Related Party Listed Patents; and (iii) all foreign counterpart patents or patent applications of any of the Related Party Listed Patents or the foregoing in (ii).

(dd)     "Related Party Protection" shall mean the limitation that no party in interest (including the Italian Trustee and the Italian Trustee Allies) who refuses to respect and accept the Original Versata License Agreement or the Amended Versata License Agreement, this Agreement, or any Related Contract as creating valid, binding and enforceable obligations of the Debtor, or who refuses to respect or accept the exclusive ownership and control of all of the

Debtor's IP as of the Effective Date by the Debtor as property of the estate of the Bankruptcy Case, or the Debtor, to the extent acting at the direction of any such party, shall be entitled to any benefit from or on account of this Agreement or the Related Contracts.

(ee)     "Reserved PLM" means the product life cycle management (PLM) product described in Exhibit C hereto.

(ff)     "TD PLM" or "TD PLM Product" means the "TD PLM" product described in Exhibit D hereto, which product expressly excludes the Reserved PLM (including in such exclusion any portion of the Reserved PLM that is or may be incorporated into any "TD PLM" product).

(gg)     "think3 Products" means all software products, including computer-aided design and product lifestyle management software, licensed under the think3 brand.

(hh)     "Versata Lawsuit" means the lawsuit filed by Versata against the Debtor in the United States District Court for the Western District of Texas, Austin Division, in the case styled and numbered *Versata FZ-LLC v. Think3, Inc.*, Civil Action No. 1:11-cv-404.

(ii)     "Versata License Agreement" means that certain Technology License Agreement, dated October 7, 2010, between Versata and think3 Inc. attached hereto as Exhibit E, as amended by this Agreement.

2.     **Conditions Precedent**.

The obligations of the Parties in this Agreement shall be subject to and conditioned upon the satisfaction of the following conditions precedent (the date on which all such conditions have been satisfied or waived in writing being referred to herein as the "Effective Date"):

(a)     The Bankruptcy Court shall have entered a final, non-appealable order in form and substance satisfactory to the Debtor, Versata, VDG, VSI, and Gensym approving this Agreement and the Related Contracts, together with appropriate injunctions protecting and effectuating this Agreement, provided that such order includes at least the following findings of fact or conclusions of law, as applicable:

(i)     that the parties have acted in good faith under 11 U.S.C. § 363(m);

(ii)     that the Original Versata License Agreement and related transactions with the Debtor were valid, fair, equitable, at fair market value and on arm's-length terms providing reasonably equivalent and fair value to the Debtor at the time of the transaction, which value was paid appropriately to and for the benefit of the Debtor and which satisfied valid and proper claims owing to employees and critical vendors of the Debtor or to taxing authorities;

(iii)     that the Original Versata License Agreement was fully completed and consummated at the closing date, so as to transfer all of the IP subject thereto to Versata immediately and completely, and Versata's right, title and interest in and to its IP and customer contracts are vested and non-executory and consistent with the provisions of this Agreement;

(iv)    that this proposed settlement is fair and equitable, for sufficient consideration, in the best interest of the Debtor's creditors, and consistent with applicable law;

(v)    that the facts and legal conclusions contained in <u>Section 7</u> hereof are each true and correct; and

(vi)    such other matters as may be agreed upon between Versata and the Debtor.

(b)    Versata shall have paid in full to the Debtor the amounts required by this Agreement in accordance with Section 4 hereof;

(c)    Each of the Related Contracts, including such other related contracts as may be mutually agreed to by the Parties prior to the conclusion of the hearing in the Bankruptcy Court to approve this Agreement, shall have been executed by the Debtor and Versata, in form and substance satisfactory to both Parties;

(d)    The asset valuations described in <u>Exhibit F</u> hereto shall have been completed in form and substance satisfactory to the Parties; and

(e)    The Parties shall have complied in all material respects with Federal Rules of Bankruptcy Procedure and all applicable orders in connection with the Bankruptcy Case, including the making of proper notice as required.

3.    **Obligations of VDG and VSI.**

(a)    <u>Related Party TD PLM License</u>.  Subject to the Italian Carve-Out, the Allied U.S. IP Party Reservations and the Related Party Protection, and if the Related Party Conditions are and remain satisfied, each of VDG and VSI hereby grants to the Debtor's Chapter 11 Estate, and the Debtor's Chapter 11 Estate hereby accepts, a nonexclusive right and license, with the right to grant and authorize sublicenses solely as set forth in the last sentence of this Section 3(a), under the Related Party Patents, to (a) manufacture, have manufactured, use, sell, offer for sale, or import TD PLM Products, (b) use, reproduce, distribute, perform, or display TD PLM Products, (c) make (or have made) modifications, improvements, enhancements or further developments to TD PLM Products, and (d) otherwise market, support, and commercially exploit TD PLM Products ("<u>Related Party TD PLM License</u>").  If the Debtor's Chapter 11 Estate obtains a settlement of certain disputes with the Italian Trustee satisfactory to Licensee in form and substance by means of (i) the Italian Trustee's execution of the Settlement Agreement, (ii) a general release of Versata, the Allied U.S. IP Parties and their affiliates and related parties and agents, and (iii) consent to the terms and conditions thereof and the related rights and benefits provided thereunder to Licensee, then the Debtor's Chapter 11 Estate may grant sublicense(s) of the Related Party TD PLM License.

(b)    <u>Related Party Research and Development License</u>.  Subject to the Italian Carve-Out, the Allied U.S. IP Party Reservations and the Related Party Protection, and if the Related Party Conditions are and remain satisfied, each of VDG and VSI hereby grants to the Debtor's Chapter 11 Estate, and the Debtor's Chapter 11 Estate hereby accepts, a nonexclusive right and license, with the right to grant and authorize sublicenses solely as set forth in the last sentence of

10

this Section 3(b), under the Related Party Patents, to perform research and development activities anywhere in the world for the sole purpose of developing CAD Products ("Related Party Research and Development License").  If the Debtor's Chapter 11 Estate obtains a settlement of certain disputes with the Italian Trustee satisfactory to Licensee in form and substance by means of (i) the Italian Trustee's execution of the Settlement Agreement, (ii) a general release of Versata, the Allied U.S. IP Parties and their affiliates and related parties and agents, and (iii) consent to the terms and conditions thereof and the related rights and benefits provided thereunder to Licensee, then the Debtor's Chapter 11 Estate may grant sublicense(s) of the Related Party Research and Development License.

(c)      Covenant Not to Enforce Collection.

(i)      Subject to the Italian Carve-Out, the Allied U.S. IP Party Reservations and the Related Party Protection, and if the Related Party Conditions are and remain satisfied, each of VDG and VSI agrees that until an applicable condition set forth in Section 3(c)(ii) has been met, it shall not enforce against any property of the Chapter 11 Estate any judgment that may be entered in its favor in the Patent Lawsuit or otherwise take any collection actions against the Chapter 11 Estate assets after the Effective Date of this agreement; provided that nothing herein shall prevent VDG or VSI from enforcing any judgment against the Italian Trustee or the Italian Estate (subject to any turnover right of the Chapter 11 Estate) from any asset under their possession or control.  The foregoing agreement is personal to the Debtor's Chapter 11 Estate, and non-transferable, cannot be assigned, transferred or delegated to any third party, and shall not be construed as a license grant, authorization, or an encumbrance on any Related Party Patent or a waiver by VDG or by VSI of the retroactive use and enforcement of the rights and remedies available under any Related Party Patent upon any applicable condition set forth in Section 3(c)(ii) having been met.

(ii)      Each of VDG and VSI shall be relieved of its obligations under Section 3(c)(i) above (a) when any of the Related Party Conditions are not satisfied; (b) when the Debtor has brought or maintained through proceedings with a government patent office, administration, agency, court, or other similar authority any form of claim alleging that activities of the Debtor do not infringe (whether directly or contributorily) or do not induce the infringement of any Related Party Patent or challenging the validity or enforceability of, or seeking to oppose through such authority the issuance of or narrow the issued or applied for claims, scope, or duration of, any of the claims of any Related Party Patent, including without limitation any interferences, reexaminations, or other proceedings in the U.S. Patent and Trademark Office, oppositions in the European Patent Office or any other similar office, administration, or agency throughout the world; or (c) at any time after one year from the date of this Agreement if the Debtor takes any action at the direction of the Italian Trustee or any party other than Debtor's Management or a successor or assign of Debtor approved in writing by VDG, VSI, Versata and the Bankruptcy Court.

4.      **Obligations of Versata.**

(a)      Amendment of the Original Versata License Agreement.  Upon the Effective Date, the Original Versata License Agreement shall be amended as follows:

(i)     The introductory paragraph to Section 1 of the Original Versata License Agreement shall be amended and restated in its entirety as follows:

For purposes of this Agreement, the following terms shall have the meanings and definitions set forth below, with capitalized terms used but not otherwise defined herein having the meanings given them in the Settlement Agreement described below:

(ii)    Section 1 of the Original Versata License Agreement shall be amended to include the following additional definitions:

"Cross-License Conditions" shall mean the following: (a) this Agreement, the Settlement Agreement and the Related Contracts remain in full force and effect; (b) the Debtor, or its authorized successors and assignees, continues to perform its obligations under this Agreement, the Settlement Agreement and the Related Contracts for Versata, VDG and VSI (as the case may be); (c) each of Versata, VDG and VSI continues to receive the full benefit of its bargain thereunder; (d) Licensor is and remains (i) a debtor-in-possession in the Bankruptcy Case under the control of Debtor's Management or (ii) an entity under the control of a successor or assignee of Licensor approved in writing by Licensee and by the Bankruptcy Court; and (e) the action(s) for which the Debtor claims to be licensed pursuant to the rights and licenses granted in this Agreement is/are taken at the express direction of Debtor's Management or such a successor or assignee.

"Cross-License Protection" shall mean the limitation that no party in interest (including the Italian Trustee and the Italian Trustee Allies) who refuses to respect and accept this Agreement (whether or not as amended), the Settlement Agreement, or any Related Contract as creating valid, binding and enforceable obligations of the Debtor, or who refuses to respect or accept the exclusive ownership and control of all of the Debtor's IP as of the Effective Date by the Debtor as property of the estate of the Bankruptcy Case, or the Debtor, to the extent acting at the direction of any such party, shall be entitled to any benefit from or on account of the Settlement Agreement or the Related Contracts.

"Licensee CAD Improvements" shall mean the modifications, improvements, enhancements and further developments made by or for Licensee to the Licensee CAD Products. Licensee CAD Improvements includes, without limitation, the most recent upgraded version of the Licensee CAD Products developed by Licensee as of the Effective Date of the Settlement Agreement (as defined in the Settlement Agreement).

"Licensee CAD Products" shall mean the CAD products set forth on Exhibit G to the Settlement Agreement as such CAD products were initially provided to Licensee by Licensor under this Agreement.

"Settlement Agreement" shall mean that certain Settlement Agreement, dated as of September __, 2011, among think3 Inc., Versata FZ-LLC and Versata Development Group, Inc. (formerly known as Trilogy Development Group, Inc.), and Gensym Cayman L.P.

(iii)    The Original Versata License Agreement shall be further amended to add a new section 2.4, as follows:

2.4    Subject to the Italian Carve-Out, the Allied U.S. IP Party Reservations and the Cross-License Protection, and if the Cross-License Conditions are and remain satisfied, Licensee hereby grants to Licensor, and Licensor hereby accepts, a nonexclusive right and license, with the right to grant and authorize sublicenses solely as set forth in the second-to-last sentence of this Section 2.4, under Licensee's copyrights, trade secrets and patents as of the Effective Date (as defined in the Settlement Agreement) to:

(I)    (a) manufacture, have manufactured, use, sell, offer for sale, or import the Licensee CAD Improvements in connection with CAD Products in or into China, (b) use, reproduce, distribute, perform, or display the Licensee CAD Improvements in connection with CAD Products in China, (c) make (or have made) modifications, improvements, enhancements or further developments to the Licensee CAD Improvements in connection with CAD Products in China, and (d) otherwise market, support, and commercially exploit the Licensee CAD Improvements in connection with CAD Products within China; and

(II)    perform research and development activities anywhere in the world for the sole purpose of incorporating Licensee CAD Improvements into CAD Products solely for commercialization in China pursuant to the license set forth above in clause (I) of this Section 2.4.

The license granted in this Section 2.4 is the "Licensee CAD License." If the Debtor's Chapter 11 Estate obtains a settlement of certain disputes with the Italian Trustee satisfactory to Licensee in form and substance by means of (i) the Italian Trustee's execution of the Settlement Agreement, (ii) a general release of Versata, the Allied U.S. IP Parties and their affiliates and related parties and agents, and (iii) consent to the terms and conditions thereof and the related rights and benefits provided thereunder to Licensee, then the Debtor's Chapter 11 Estate may grant sublicense(s) of the Licensee CAD License. During the term of the Licensee CAD License, on an annual basis (but no more frequently than once a year), Licensee shall make available to Licensor a data package that includes all of the source code for the Licensee CAD Improvements to the extent not already provided to Licensor.

(iv)    The Original Versata License Agreement shall be further amended to add a new section 2.5, as follows:

2.5    Subject to the Italian Carve-Out, the Allied U.S. IP Party Reservations and the Cross-License Protection, and if the Cross-License Conditions are and remain satisfied, Licensee hereby grants to Licensor, and Licensor hereby accepts, a nonexclusive right and license, with the right to grant and authorize sublicenses solely as set forth in the last sentence of this Section 2.5, under Licensee's copyrights, trade secrets and patents as of the Effective Date (as defined in the Settlement Agreement), to (a) manufacture, have manufactured, use, sell, offer for sale, or import TD PLM Products, (b) use, reproduce, distribute, perform, or display TD PLM Products, (c) make (or have made) modifications, improvements, enhancements or further developments to TD PLM Products, and (d) otherwise market, support, and commercially exploit TD PLM Products ("Licensee TD PLM License").    If the Debtor's Chapter 11 Estate obtains a settlement of certain disputes with the Italian Trustee satisfactory to Licensee in form and substance by means of (i) the Italian Trustee's execution of the Settlement Agreement, (ii) a general release of Versata, the Allied U.S. IP Parties and their affiliates and related parties and agents, and (iii) consent to the terms and conditions thereof and the related rights and benefits provided thereunder to Licensee, then the Debtor's Chapter 11 Estate may grant sublicense(s) of the Licensee TD PLM License.

(v)    The Original Versata License Agreement shall be further amended to add a new section 2.6, as follows:

2.6    Subject to the Italian Carve-Out, the Allied U.S. IP Party Reservations and the Cross-License Protection, and if the Cross-License Conditions are and remain satisfied, Licensee hereby grants to Licensor, and Licensor hereby accepts, an option for Licensor's Chapter 11 Estate obligations under the DIP Loan Agreement to be deemed satisfied in full.    Such option may be exercised by Licensor by executing a written agreement evidencing such exercise in form and substance mutually agreed by Licensor and Licensee, provided that the Debtor (a) has terminated the Licensee TD PLM License, and (b) has given a general release to Versata and the other Allied U.S. IP Parties and their employees, officers, directors, partners, affiliates, members, professionals and agents, in each case of (a) and (b) in form and substance reasonably satisfactory to Licensee.

(vi)    The Original Versata License Agreement shall be further amended to add a new section 2.7, as follows:

2.7    Subject to the Cross-License Protection, every license or sublicense granted hereunder by Licensee to Licensor shall be a cross-license conditional and dependent upon the reciprocal licenses granted hereunder by Licensor to Licensee.    Further subject to the Cross-License Protection, rejection or breach of any such license to Licensee shall excuse Licensee from any obligation to perform its reciprocal licenses and sublicenses to Licensor; provided that, as long as the Debtor as Licensor is ready and willing and able to perform its licenses to the Licensee, then Licensee shall perform its reciprocal licenses to the

Debtor's Chapter 11 Estate, but without any obligation of Licensee to the Italian Estate, who shall receive no benefits without the corresponding burdens, in accordance with the Italian Carve-Out and the Allied U.S. IP Party Reservations.

(vii)    The Original Versata License Agreement shall be further amended to add a new section 6.5, as follows:

> 6.5    With respect to any and all information, not in the public domain, that relates to any or all of the Licensee CAD Improvements (including source code therefor), the Reserved PLM or to the business, plans, affairs or activities of Licensee or its licensors (other than Licensor) ("**Licensee Confidential Information**"), Licensor shall comply with the confidentiality obligations of Licensee set forth in Sections 6.1, 6.2, and 6.3 as if Licensor were Licensee and Licensee Confidential Information were Confidential Information, *mutatis mutandis*.  Upon termination of the Agreement, Licensor shall return to Licensee all copies of all documents and other materials that contain or embody any Licensee Confidential Information that are in the possession of Licensor as of the date of termination.  Licensor's obligations under this Section 6.5 shall survive the termination of this Agreement for any reason whatsoever.

(b)    <u>Customer Support</u>.  Subject to mutually satisfactory documentation and the Italian Carve-Out and Allied U.S. IP Party Reservations, on reasonable request of the Debtor's Management, Versata shall provide current customers of think3 Products with software support on a mutually agreed basis consistent with Versata's efforts for its own comparable customers; provided that Versata shall have no obligations to any customers of the Italian Trustee or any entity under his control or influence or who remit payments in connection with think3 Products to the Italian Trustee or any such entity.  Versata and the Debtor agree to execute the Customer Support Agreement as soon as is reasonably practicable after the Effective Date.

(c)    <u>Certain Releases</u>.  Effective upon the Effective Date, but subject to the Italian Carve-Out and Allied U.S. IP Party Reservations, Versata hereby releases the Debtor's Chapter 11 Estate (but not any third party, including the Italian Trustee and Italian Estate) from (i) any further obligation under any inter-company management services agreement with any of the Debtor's U.S. parent or its U.S. affiliates and (ii) 50% of any accrued sums owing thereunder as of the Effective Date of this Agreement, in consideration for the allowance in the Bankruptcy Case of the remaining half of such accrued liability as claims against the Debtor.  Versata also hereby releases the CRO (as distinguished from the Debtor) from any and all manner of claims, causes of action, suits, debts, obligations, liabilities, duties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, and demands whatsoever, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, asserted or unasserted, whether in law, admiralty or equity or however else arising, whether contingent, absolute, inchoate or otherwise (collectively, "<u>CRO Claims</u>"), that Versata ever had, now has or hereafter can, shall or may have, whether directly or indirectly, against the CRO or such other releases, for, upon, relating to, or by reason of any matter, cause or thing whatsoever, at any time up to and including the date hereof in connection with the Bankruptcy Case, the Versata License Agreement, or the actions of the CRO in connection therewith or relating thereto.

(d)    Payment of Settlement Amount.  Upon the Effective Date, Versata shall pay $250,000 to the Debtor's Chapter 11 Estate.

(e)    Covenant Not to Enforce Collection.  In exchange for the allowed claim against the Chapter 11 Estate set forth in Section 5(b) of this Agreement, Versata agrees not to enforce against any property of the Chapter 11 Estate any judgment that may be entered in its favor in the Versata Lawsuit or Patent Lawsuit or otherwise take any collection actions against the Chapter 11 Estate assets after the Effective Date of this Agreement; provided that nothing herein shall prevent Versata from enforcing any judgment against the Italian Trustee or the Italian Estate (subject to any turnover right of the Chapter 11 Estate) from any asset under their possession or control.

(f)    Marketing Plan Support.  Subject to the Italian Carve-Out Versata shall support a reasonable and mutually agreeable joint marketing plan with the Debtor's Chapter 11 Estate in order to calm and reassure customers of think3 Products and thereby to facilitate an opportunity for the Debtor's Chapter 11 Estate to penetrate the China market and to develop the Licensee Cross-License.

(g)    Website Recovery.  Versata shall provide its best efforts to support the Debtor's Chapter 11 Estate's attempts to recover its website and to correct the incorrect information posted thereon by or for the Italian Trustee or his restarted version of the Debtor.

(h)    Indemnification.  Versata shall indemnify the CRO to the maximum extent permitted by Delaware law against any losses, claims, damages, liabilities or expenses (including, without limitation, attorney fees, disbursements, and related expenses) to which the CRO may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against the CRO as a result of this Agreement.  If the CRO becomes involved in any action, suit, proceeding, or investigation in connection with any matter arising out of or in connection with this Agreement, Versata shall periodically advance or otherwise reimburse on demand the CRO's reasonable legal and other expenses (including, without limitation, attorney fees, disbursements, and related expenses) incurred in connection therewith.

5.    **Obligations of the Debtor.**

(a)    Assumption and Assignment of Amended Versata License Agreement and Related Sale.

(i)    The Debtor hereby assumes and reaffirms the Versata License Agreement, as amended by this Agreement, pursuant to 11 U.S.C. § 365 and other applicable law, including the Amended Versata License Agreement.

(ii)    Notwithstanding the prior transfer of intellectual property rights to Versata under the Versata License Agreement, in order to avoid or minimize any further disputes in Italy or other jurisdictions, the Debtor hereby sells and transfers pursuant to 11 U.S.C. § 363(f) all of its right, title and interest in and to those rights of the Debtor previously licensed to Versata under the Versata License Agreement, as amended by this Agreement, including without limitation:

(1)     The absolute ownership of the derivative copyrights, and source and object code related thereto, as to the software products listed in Exhibit H hereto, which the Debtor acknowledges and agrees were transferred to Versata under the Versata License Agreement before its purported and disputed rejection by the Italian Trustee in the Italian Bankruptcy Court pursuant to Section 72 of the Italian Bankruptcy Law.  This shall include the exclusive right as owner for Versata to reproduce, distribute, perform, display, and prepare derivative works based upon, in source and object code, those acquired assets and to acquire more copyrights thereon throughout the world;

(2)     The absolute ownership of the trademarks listed in Exhibit I and the goodwill therein, which the Debtor acknowledges and agrees were transferred to Versata under the Versata License Agreement before its purported and disputed rejection by the Italian Trustee in the Italian Bankruptcy Court pursuant to Section 72 of the Italian Bankruptcy Law. This includes the exclusive right of Versata to use such trademarks in commerce and hereafter to create similar trademarks for upgraded or derivative products that Versata has a right to develop, use, market, make, have made, or sell under this Agreement or the Related Contracts, such as for example, by adding higher numbers or dates for later versions of the product or code (e.g., 2011.4 could inspire 2011.5 or 2012.1);

(3)     The vesting as a fully completed and executed transfer of all other rights, IP and products under the Versata License Agreement, as amended by this Agreement, to the maximum extent permitted by applicable law.  As a result, there can be no future (or past) rejection of the Versata License Agreement, as amended by this Agreement, whether by 11 U.S.C. § 365, Italian Bankruptcy Law § 72, or otherwise, that would or could have the power to deprive Versata of any right to use, sell, make, have made, or market the products (including the IP) permitted by the Versata License Agreement, as amended by this Agreement; and

(4)     All of Versata's right, title and interest as to (i) the rights and licenses of Versata under the Amended License Agreement; and (ii) the rights of Versata as to its customers and their contracts and related receivables.

(iii)     As a result of the foregoing transfers set forth in Section 5(a)(ii) above, to the full and maximum extent of the right, power and jurisdiction of the Bankruptcy Court in accordance with U.S. law, and binding the Debtor and all persons within the jurisdiction of that Court, including the Italian Trustee and the Italian Court, the Debtor and Versata intend and acknowledge that Versata shall hereafter have the exclusive rights, among other things, to reproduce, distribute, perform, display, create derivative works based upon, use, create, market, make, have made, offer for sale, import, and sell, label, brand, disclose, sublicense, or transfer any product or IP permitted by the Versata License Agreement, as amended by this Agreement, and bring claims for past, present or future infringement thereof, which shall exist as a valid and binding right and obligation of the Debtor, enforceable in accordance with its terms to the full extent of applicable U.S. laws.  All such right, title and interest of Versata shall be free and clear of all liens, adverse interests, claims, or encumbrances of every kind, which liens, adverse interests, claims and encumbrances shall (to the extent required by 11 U.S.C. § 365) attach to the proceeds of such transfer received by the Debtor, subject to all defenses of the Debtor.

(b)    <u>Allowance of Versata's Claim</u>.  The Debtor hereby agrees that Versata shall have an allowed general unsecured claim in the Debtor's Bankruptcy Case in the amount of $100,000 on account of the breaches of the Versata License Agreement described in Versata's pending suit against the Debtor in the Western District of Texas Court in exchange for the releases by Versata set forth above in Section 4(c), but also preserving the Italian Carve-Out and Allied U.S. IP Party Reservations so as to allow that suit to continue against the Italian Trustee and Italian Estate.

(c)    <u>Release by Debtor</u>.  Subject to the satisfaction of the conditions precedent set forth in Section 2 hereof, the Debtor hereby releases Versata and each of the Allied U.S. IP Parties and any of its affiliates or any of their respective officers, directors, employees, agents, customers and vendors from any and all manner of claims, causes of action, suits, debts, obligations, liabilities, duties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, and demands whatsoever, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, asserted or unasserted, whether in law, admiralty or equity or however else arising, whether contingent, absolute, inchoate or otherwise (collectively, "<u>Claims</u>"), that the Debtor ever had, now has or hereafter can, shall or may have, whether directly or indirectly, against Versata, ESW, or the Allied U.S. IP Parties or such other releasees, for, upon, relating to, or by reason of any matter, cause or thing whatsoever, at any time up to and including the date hereof in connection with the Merger, the Versata License Agreement, or the actions of such released parties in connection therewith or relating thereto or the continued defense or exercise of their rights and interests thereunder, including without limitation despite the contrary demands of the Italian Trustee.

6.    **Amendment of DIP Loan Agreement.**

The Debtor, Versata, and Gensym wish to amend the DIP Loan Agreement in order to cover a mutually agreed budget for funding certain additional expenses necessary for effectuating this Agreement and for attempting to deal constructively with the Italian Trustee in pursuit of any collaboration, cooperation or settlement as may be possible.  Accordingly, subject to the approval of the Bankruptcy Court after a duly noticed hearing on the motion contemplated in clause (f) below, the Debtor, Versata, and Gensym agree that the DIP Loan Agreement shall be amended as follows:

(a)    The second recital of the DIP Loan Agreement shall be amended and restated in its entirety as follows:

WHEREAS, Borrower has requested that the Lender provide a revolving credit facility in an aggregate principal amount not exceeding $2,300,000 on a post-petition basis on the terms and conditions set forth herein; and

(b)    The definition of "Commitment" in Section 1 of the DIP Loan Agreement shall be amended and restated in its entirety as follows:

"<u>Commitment</u>" means the commitment of the Lender to make Loans to the Borrower hereunder, as such commitment may be reduced from time to time pursuant to Section 2.6(b).  The aggregate amount of the Lender's Commitment is $2,300,000.

(c)     The definition of "Maturity Date" in Section 1 of the DIP Loan Agreement shall be amended and restated in its entirety as follows:

> "Maturity Date" means the earliest of (a) the date of termination in whole of the Commitment pursuant to Sections 2.6(a) or (b); (b) January 15, 2012; (c) the first date on which all consideration to be paid or provided by a purchaser in any sale, transfer or other disposition of all or substantially all of the Borrower's assets pursuant to Section 363 of the Bankruptcy Code has been paid or provided; (d) the date thirty (30) days after the date of the consummation of a plan of reorganization in the Chapter 11 Case, as specified in such plan or plans, and (e) the date of termination in whole of the Commitment pursuant to Section 5.

(d)     Except as expressly amended pursuant hereto, the DIP Loan Agreement shall remain unchanged and in full force and effect and is hereby ratified and confirmed in all respects.  The execution and delivery of, or acceptance of, this amendment and any other documents and instruments in connection herewith shall not be deemed to create a course of dealing or otherwise create any express or implied duty by any of them to provide any other or further amendments, consents or waivers in the future.

(e)     Gensym agrees to the option to deem the Chapter 11 Estate's DIP Loan Agreement obligations satisfied as provided in Section 2.6 of the Amended Versata License Agreement.

(f)     The Debtor agrees to file, and Versata and Gensym agree to support, a motion seeking approval of the amendments to the DIP Loan Agreement in the Bankruptcy Court.

7.     **Acknowledgments by the Parties.**

The Parties each agree to and acknowledge the following:

(a)     Any order entered by the Bankruptcy Court in connection with the Bankruptcy Case shall apply to all property of the Debtor and all custodians, creditors, and other parties in interest wherever located in the world, including the Italian Trustee and Italian Estate.

(b)     Any transfers of any property of the Debtor's Chapter 11 Estate pursuant to this Agreement are free and clear of all liens, claims and adverse interests in accordance with Bankruptcy Code § 363(f), and any allowed claims of the Italian Trustee shall attach to the Debtor's proceeds of the settlement, subject to the Italian Carve-Out and Allied U.S. IP Party Reservations.

(c)     Any coordination or cooperation with the Italian Trustee must be reciprocal from the Italian Trustee, and can be no greater than what would apply to a foreign representative from a foreign non-main proceeding, if and to the extent such foreign representative sought Chapter 15 recognition, although always subject to the Italian Carve-Out and Allied U.S. IP Party Reservations.

(d)     All of the Debtor's property subject to this Agreement is property of the Debtor's Chapter 11 Estate under Bankruptcy Code § 541 and protected by 11 U.S.C. § 1529(1) and other applicable U.S. law.

(e)     In order to preserve the value of the Debtor's assets, to prevent substantial claims by disappointed customers of think3 Products and creditors, and to advance the Debtor's business strategy for China, the Debtor needs customer confidence, which can only occur when:

(i)     the IP ownership is resolved in favor of Versata, which is the best party ready, willing and able to provide the necessary upgrades and service for think3 Products;

(ii)     the Debtor receives the technological, marketing and financial support needed for confirming a plan of reorganization and to advance its business strategy in China and with respect to the Licensee Cross-License; and

(iii)     the Debtor is able to perform and avoid breaching its more than 50 U.S. customer licenses and many other offshore customer licenses.

(f)     But for this settlement, the only option for Versata and licensee-customers of the Debtor and/or Versata would be to litigate to protect their rights, resulting in massive expense and claim exposure to the Debtor's estate, as well as prolonged uncertainty and negative publicity and market-relevant facts that would obstruct the reorganization of the Debtor and would deprive the Debtor and its creditors of the value available from the kind of collaboration discussed herein.

(g)     Even if somehow the Italian Trustee were able to prevail in its disputes with Versata and the Debtor, the Related Party Patents would continue to bar the Italian Trustee from its efforts to usurp the business operations of the Debtor, because there is no patent license for think3 Products that infringe such Related Party Patents.

8.     **As Is/Where Is; Defense Rights and Derivative Standing of Versata.**

(a)     The Parties acknowledge that transfers of property by the Debtor set forth in this Agreement are made as-is, where-is, without any representations or warranty, whether express or implied, except as expressly stated in this Agreement, notwithstanding any allegations to the contrary that may be asserted by the Italian Trustee; provided, however, that, notwithstanding the operation of 11 U.S.C. § 362 or § 105 or any other provision of applicable law that would otherwise impair, deny or stay or obstruct such rights or standing for Versata, Versata shall have the right and standing at any time, whether directly in its own name or derivatively in the name of the Debtor, to:

(i)     Enforce and defend the rights, titles, interests and defenses of Versata under this Agreement and the Versata License Agreement, as amended by this Agreement and any Related Contracts;

(ii)     Enforce and defend any and all claims and causes of action that may arise or exist in favor of Versata under this Agreement or the Versata License Agreement, as amended by this Agreement, including any claims against the Italian Trustee or the Italian Estate or any

Italian Trustee Allies, including any Italian Former Employee Defendants, whether at law or in equity or otherwise; and

       (iii)    Enforce and defend in its own name or in the name and place of the Debtor the titles, interests, defenses, claims, causes of action, remedies and other rights of the Debtor against the Italian Trustee, the Italian Estate or any other person or entity, including any Italian Trustee Allies, who may impair, challenge, dispute, obstruct, interfere with, or otherwise harm this Agreement or any property of the Debtor, wherever located in the world, that is subject or related to, or necessary or desirable for the performance of, any obligation, right or interest of the Debtor in connection with this Agreement or the Versata License Agreement, as amended by this Agreement. In exercising that right on behalf of the Debtor, Versata may take any action that the Debtor or a trustee in bankruptcy under the Bankruptcy Code could take, upon five (5) business days notice to the CRO or the CRO's designee. For example, and without limitation, Versata could throughout the world sue on behalf of the Debtor to enforce, confirm or defend its right, title and interest as to the assets subject to this Agreement or the Versata License Agreement, as amended by this Agreement, including by joining in support of actions that Versata itself may bring in its own name and right for such purposes. The expenses, including attorneys' fees and costs, that Versata may incur in such efforts under this subsection (iii) shall be borne by Versata, except that (i) Versata shall have the right to deduct its expenses, including attorneys' fees and costs, from any recovery that Versata may make so acting in the name of the Debtor, and (ii) Versata reserves the right to make a "substantial contributions claim" or similar recovery for such efforts on behalf of the Debtor pursuant to 11 U.S.C. § 503(b)(3) or (4) or otherwise. The effect and intent of this subsection (iii) is to empower Versata, among other things, to do for itself in the place of the Debtor what the Debtor could do to so defend and enforce the rights, titles, interests, defenses, claims and causes of actions, if it had the available funds and motivation to do so, but the Debtor retains its own right to do so itself, if it elects to do so, in which case Versata shall defer to the Debtor so electing to take any such action for its own account.

       9.    **Limitations on Scope.**

       (a)    The Parties agree that, for purposes of this Agreement, the Italian Carve-Out and Allied U.S. IP Party Reservations shall apply to the provisions of this Agreement, the Amended Versata License Agreement, and the Related Contracts in all respects, and that neither the Italian Trustee nor any Italian Trustee Allies shall be deemed a party to or beneficiary of this Agreement, the Amended Versata License Agreement or any Related Contracts.

       (b)    The Parties acknowledge that, while reference is made to certain other "Allied U.S. IP Parties," such other Allied U.S. IP Parties (other than VDG and VSI) are not parties to or bound by this Agreement. Rather, the Parties intend this Agreement to describe the arrangements that Versata, VDG and VSI are making independently with such other Allied U.S. IP Parties in order to enable Versata, VDG and VSI to provide certain benefits as a licensee of those non-parties. Thus, if the Italian Trustee or the Italian Trustee Allies have a grievance with respect to this Agreement and related matters, that grievance is limited to Versata, VDG and VSI, and the Allied U.S. IP Parties (other than Versata, VDG and VSI) reserve all of their interests, defenses, claims, causes of action, remedies and other rights against the Italian Trustee,

the Italian Estate and the Italian Trustee Allies as if there were no Agreement having any reference to them.

10. **No Waiver.** The Parties agree that, notwithstanding anything herein to the contrary, in no event shall the terms of this Agreement constitute a waiver of any defenses or arguments that any Party may have in any pending litigation against the Italian Trustee or any Italian Trustee Allies.

11. **Further Assurances.** Each of the Parties will, from time to time, execute and deliver, or cause to be executed and delivered, such additional or further transfers, assignments, endorsements, consents and other instruments as the other party may reasonably request for the purpose of effectively carrying out the transactions contemplated by this Agreement and eliminating any Claims to be released hereunder.

12. **Interpretation.** The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Wherever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".

13. **Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the State of Texas without regard to any applicable conflicts of law.

14. **No Third-Party Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of each Party hereto and their respective successors and permitted assigns, and the Parties do not intend to confer third-party beneficiary rights upon any other person.

15. **Counterparts.** This Agreement may be executed (including, without limitation, by facsimile signature) in one or more counterparts, with the same effect as if the Parties had signed the same document. Each counterpart so executed shall be deemed to be an original, and all such counterparts shall be construed together and shall constitute one agreement.

16. **Severability.** If any provision of this Agreement, or the application of any such provision to any person or entity or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to persons or entities or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

17. **Entire Agreement.** This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, among the parties. The Parties hereto intend that this Agreement be the several, complete and exclusive embodiment of their agreement, and that any evidence, oral or written, of a prior or contemporaneous agreement, whether oral, implied, written or otherwise arising, that alters or modifies this Agreement shall be waived, released and superseded hereby and shall not be admissible in any proceeding concerning this Agreement.

sf-3012633

The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

*[Signature page follows.]*

IN WITNESS WHEREOF, the undersigned has duly executed this Agreement as of the date first set forth above.

**THINK3 INC., a Delaware corporation and debtor-in-possession**

By: _____
Name:
Title:

**VERSATA FZ-LLC, a company organized and existing under the Dubai Technology and Media Free Zone**

By: _____
Name:
Title:

**VERSATA DEVELOPMENT GROUP, INC., a Delaware corporation (formerly known as Trilogy Development Group, Inc.)**

By: _____
Name:
Title:

**VERSATA SOFTWARE, INC., a Delaware corporation**

By: _____
Name:
Title:

**GENSYM CAYMAN L.P., a Cayman Islands exempted limited partnership**

By: _____
Name:
Title:

**TABLE OF EXHIBITS**

| Letter | Description |
|--------|-------------|
| A | CAD Products |
| B | Related Party Listed Patents |
| C | Reserved PLM description |
| D | TD PLM Product description |
| E | Versata License Agreement |
| F | Asset Valuations descriptions |
| G | Licensee CAD Products |
| H | Software Products Transferred to Versata Pursuant to § 363(f) |
| I | Trademarks Transferred to Versata Pursuant to § 363(f) |

**EXHIBIT A**
to
**Settlement Agreement**

<u>CAD Products</u>

"CAD" shall mean the software products for computer-aided design (CAD) developed by or for Think3 Inc., including the product known as "thinkDesign." However, "CAD" expressly excludes the Reserved PLM (including in such exclusion any portion of the Reserved PLM that is or may be incorporated into any "CAD" product). This <u>Exhibit A</u> shall be subject to further revision as may be agreed upon in writing by the Parties.

**EXHIBIT B**
to
**Settlement Agreement**

<u>Related Party Listed Patents</u>

| US Patent | Title |
|---|---|
| 6002854 | Method And Apparatus For Configuring Systems |
| 6675294 | Method And Apparatus For Maintaining And Configuring Systems |
| 6981207 | Automatic Documentation Of Configurable Systems By Outputting Explanatory Information Of Configuration Parameters In A Narrative Format And Configuration Parameters Differences |
| 6405308 | Method And Apparatus For Maintaining And Configuring Systems |
| 7200583 | Method And Apparatus For Attribute Selection |
| 7043407 | Method And Apparatus For Configuring Systems |
| 6836766 | Rule Based Configuration Engine For A Database |
| 7188335 | Product Configuration Using Configuration Patterns |

**EXHIBIT C**
to
**Settlement Agreement**

<u>Reserved PLM</u>

"Reserved PLM" shall mean the client-application-based product life cycle management suite of products known as "thinkPLM" and developed by or for Think3 Inc., including the products known as "thinkteam," "thinkconfigure," "thinkchange," "thinkproject," "thinkmaintain," "thinkprint," "ThinkDesign Viewer," and "Webteam." For the avoidance of doubt, "Reserved PLM" includes all product life cycle management products or components thereof developed by or for Think3 Inc. that, have prior to the Effective Date of the Settlement Agreement, been sold to customers of the Debtor, Versata, or either of their affiliates.  This <u>Exhibit C</u> shall be subject to further revision as may be agreed upon in writing by the Parties.

**EXHIBIT D**
**to**
**Settlement Agreement**

<u>TD PLM</u>

"TD PLM" shall mean the web-based task-driven product life cycle management product known as "TD PLM" and developed by or for Think3 Inc., which product employs a web-based graphical user interface, centralized administration, and 3-tier architecture. However, "TD PLM" expressly excludes the Reserved PLM (including in such exclusion any portion of the Reserved PLM that is or may be incorporated into any "TD PLM" product). <u>This Exhibit D</u> shall be subject to further revision as may be agreed upon in writing by the Parties.

**EXHIBIT E**
**to**
**Settlement Agreement**

<u>Versata License Agreement</u>

(Please see attached Technology License Agreement.)

# TECHNOLOGY LICENSE AGREEMENT

THIS TECHNOLOGY LICENSE AGREEMENT ("Agreement") is made and entered into effective as of October 7, 2010 ("Effective Date") by and between:

**Think3, Inc.,** a company organized and existing under the laws of the State of Delaware with its principal place of business located at 6011 W. Courtyard Dr., Suite 250, Austin, Texas 78730, USA ("Licensor"),

and

**Versata FZ-LLC,** a company organized and existing under the laws of Dubai Technology and Media Free Zone, with its principal place of business located at 707-708 Al Thurayal, Dubai Media City, PO Box 502092, Dubai, United Arab Emirates, ("Licensee").

(Licensor and Licensee are collectively referred to as the "Parties" and individually referred to as "Party")

## RECITALS

A.    Licensor is the owner, or authorized licensee, of certain Intellectual Property (as defined herein) relating to the design, development, manufacture, marketing, distribution, sale and license of the Products (as defined herein).

B.    Licensee desires to license from Licensor the right to utilize such Intellectual Property in the design, development, manufacture, marketing, distribution, and support of the Products within the Territory (as defined herein).

C.    Licensor is willing to grant to Licensee a license to utilize such Intellectual Property solely in accordance with the terms and conditions set forth in this Agreement.

Licensor and Licensee agree as follows:

## Section 1 - Definitions

For purposes of this Agreement, the following terms shall have the meanings and definitions set forth below:

1.1    "Affiliate" of a Party shall mean and include any entity or association controlled by, controlling or under common control with such Party. For purposes of this definition, the term "control" shall mean the ownership of more than fifty percent (50%) of the voting shares in any entity or association.

1.2    "Confidential Information" shall mean and include all information, not in the public domain, that relates to any or all of the Products and/or the Intellectual Property, or to the business, plans, affairs or activities of Licensor, or its licensors. Confidential Information may be communicated electronically, orally, visually, in writing or in any other recorded or tangible form. All information and data shall be considered to be Confidential Information hereunder (a) if Licensor has marked them as such, (b) if Licensor, electronically, orally or in writing, has advised Licensee of their confidential nature, or (c) if due to their character or nature, a reasonable person in a like position and under like circumstances would treat them as confidential.

VER000886

1.3　"Intellectual Property" shall mean and include any and all inventions, patents, patent applications, and patent disclosures (including all related divisions, continuations, continuing prosecution applications, continuations in part, reissues, renewals, reexaminations, and extensions thereof anywhere in the world), works of authorship, copyrights, Marks, trade secrets, semiconductor design rights, computer programs (in source code and object code form), flow charts, formulae, enhancements, updates, modifications, translations, adaptations, information, specifications, designs, process technology, manufacturing requirements, quality control standards, information and supply chain information systems, and any other intellectual and industrial property rights, intangible property rights, and proprietary rights, anywhere in the world, whether registered or unregistered, which are owned, licensed, or otherwise acquired by Licensor prior to or after the Effective Date, and any and all additions, modifications, enhancements, updates, extensions, derivative works, formulations or further developments thereto, which pertain to the development, testing, installation, implementation, customization, optimization, configuration, operation, support, promotion, marketing, advertising, sale, or other use of the Products.

1.4　"Marks" shall mean and include those trademarks, service marks, trade names, trade dress, logos and similar designations, whether registered or unregistered, used in connection with any or all of the Products.

1.5　"Products" shall mean and include individually and/or collectively, as the context requires, all Licensor CAD and PLM products which utilize, embody or incorporate the Intellectual Property and all related maintenance and support contracts and services ("Maintenance").

1.6　"Territory" shall mean the entire world excluding China, except for the case where a multinational company that is headquartered in the Territory wishes to license the Products both within the Territory and in which case the definition of Territory for that client will be extended to include China; *provided, however*, that the Territory may be amended from time to time as agreed between the Parties.

## Section 2 - Grant and Scope of License

2.1　Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee, and Licensee hereby accepts, an exclusive right and license, with the right to grant and authorize sublicenses, to utilize the Intellectual Property, to (a) manufacture, have manufactured, use, sell, offer for sale, or import the Products in or into the Territory, (b) use, reproduce, distribute, perform, or display the Products in the Territory, (c) make (or have made) modifications, improvements, enhancements or further developments to the Products in the Territory, and (d) otherwise market, support, and commercially exploit the Products within the Territory. Licensor also grants to Licensee such additional rights required, if any, to manufacture, market, distribute, license and sell the Products, pursuant to any agreement between the Parties regarding global deals/transactions.

2.2　Without limiting the generality of Section 2.1 hereof, Licensor also hereby grants to Licensee, and Licensee hereby accepts, an exclusive right and license, with the right to grant and authorize sublicenses, to utilize the Marks solely in conjunction with Licensee's manufacturing, marketing, distribution, sale, license, support and use of the Products, within the Territory, solely in accordance with the terms and conditions of this Agreement.

2.3　Licensor also hereby grants to Licensee, and Licensee hereby accepts, an exclusive right and license to enforce the Intellectual Property in the Territory. Licensee or its designee shall be solely responsible for taking all actions, in the courts, administrative agencies or otherwise, to prevent or enjoin any and all such infringements and unauthorized uses of the Intellectual Property, including the right to keep all damage awards related thereto; provided, however, that Licensor shall furnish Licensee with such

VER000887

assistance as Licensee shall reasonably request in connection with any such action to prevent or enjoin any such infringement or unauthorized use of any of the Intellectual Property, and shall also provide prompt written notice of actual or suspected infringements to Licensee.

### Section 3 - Licensor's Responsibilities

3.1    Licensor shall make available to Licensee (or Licensee's designee) a data package that includes all of the Intellectual Property, and such other documents that contain, embody or describe such of the Confidential Information as Licensor reasonably determines to be necessary or appropriate for Licensee's efficient manufacture/production, marketing, distribution, sale/license and use of the Products in accordance with the terms and conditions of this Agreement.

3.2    At Licensee's request, Licensor shall furnish Licensee with reasonable technical assistance relating to the manufacture/production, marketing, distribution, sale/license, and/or use of any of the Products.

3.3    At Licensee's request, Licensor shall furnish Licensee with a reasonable quantity of Licensor's promotional materials for the Products.  Licensee shall have the right to reproduce, modify and/or translate any or all such promotional materials, as Licensee reasonably determines to be necessary or appropriate for the effective marketing and distribution of the Products throughout the Territory; *provided, however*, that Licensee's rights and obligations with respect to all modifications and translations of the promotional materials furnished by Licensor under this Section 3.3 shall be as provided in Section 4.3 hereof.

### Section 4 - Licensee's Responsibilities

4.1    At the request of Licensor from time to time during the continuance of this Agreement, Licensee shall furnish Licensor with samples of each Product manufactured/produced by Licensee (or its contractors) hereunder, in order to permit Licensor to confirm that such Product conforms to all of the specifications and/or documentation therefor.  If, in Licensor's reasonable opinion, any such Products fail to conform to the specifications and/or documentation therefor, Licensee shall promptly correct all such deficiencies in such Products.

4.2    In accordance with the rights licensed to Licensee under Section 2.2, Licensee shall affix the Marks to all of the Products manufactured/produced by Licensee (or its contractors) hereunder, strictly in accordance with Licensor's trademark standards and specifications as communicated by Licensor to Licensee from time to time.  Licensee shall not affix to, or otherwise use in conjunction with, any of the Products any other trademark, trade name, symbol or logo, and shall not use any of the Marks in conjunction with any products other than the Products, except as specifically authorized in writing by Licensor.  All use of the Marks and trademark goodwill associated therewith shall inure to the benefit of the legal owner of the Marks.  Licensee shall not adopt or use any trademark, trade name, symbol or logo that is confusingly similar to any of the Marks, and shall not seek to register in its own name any of the Marks, or any translations or transliterations thereof, in any country within or outside of the Territory.

4.3    Licensee may prepare such advertising and promotional materials, including modifications and translations of the promotional materials furnished by Licensor to Licensee under Section 3.3 hereof, which, in the reasonable opinion of Licensee are necessary or appropriate for the effective marketing and distribution of the Products within the Territory; *provided, however*, that all such advertising and promotional materials shall be subject to review and approval by Licensor, which approval shall not be

3

VER000888

unreasonably withheld or delayed, prior to distribution by Licensee to customers and prospective customers in the Territory.

4.4     At all times during the continuance of this Agreement, Licensee shall maintain adequate service and support facilities within the Territory for all Products manufactured/produced hereunder by Licensee. Licensee shall be solely responsible for providing all support services, including, but not limited to, technical support and warranty services, in accordance with the applicable specifications and documentation, for all Products within the Territory manufactured/produced by Licensee hereunder. Licensee shall be solely responsible for determining the terms, conditions and limitations of all warranties made by Licensee with respect to all such Products manufactured/produced by Licensee hereunder, in accordance with applicable laws, regulations and governmental orders and local market conditions and requirements within the Territory.

4.5     Upon Licensor's request, Licensee shall submit to Licensor quarterly reports of Licensee's activities under this Agreement.

4.6     Upon reasonable notice from Licensor, Licensee shall permit Licensor's representatives, during normal business hours, to inspect Licensee's facilities, and to review Licensee's books and records, as reasonably necessary in order to permit Licensor to confirm Licensee's compliance with its obligations under this Agreement.

## Section 5 - Consideration

5.1     In consideration for the rights and licenses granted to Licensee by Licensor under this Agreement, Licensee shall pay to Licensor royalties equal to the amounts specified in the Royalty Schedule attached hereto as Exhibit 5.1. On a periodic basis, the Parties shall review Licensee's use of the rights granted under this license, and the income attributable to the use of those rights, and shall adjust the royalties prospectively or retrospectively as necessary so that the rate will be an arm's length rate.

5.2     All royalties payable by Licensee under Section 5.1 hereof shall be paid within *thirty (30)* calendar days of receipt by Licensee of Licensor's quarterly invoice or other requests for payment therefor. Unless otherwise agreed between the Parties, all royalties payable hereunder shall be paid in United States Dollars. For purposes of determining the United States Dollars amount of any and all royalties payable hereunder, all amounts received by Licensee in any currency other than United States Dollars shall be converted into United States Dollars at Licensor's internal rate of exchange as of the last day of the calendar quarter in which such amounts were received. In the event that Licensee fails to make any payment hereunder on the due date therefor, such overdue amount shall bear interest, from the due date to the date such amount is paid in full, at an arm's-length interest rate.

5.3     If Licensee is required under any applicable law, regulation or government order within the Territory to withhold any taxes or other governmental charges on any amounts payable by Licensee to Licensor under this Section 5, Licensee shall withhold, and shall pay over to the appropriate governmental authorities, all such taxes and other governmental charges. Licensee shall obtain, and shall furnish to Licensor on a timely basis, official tax receipts or other evidence of payment of all such taxes and other governmental charges, sufficient to permit Licensor to establish Licensor's right to a credit for such taxes and other governmental charges against Licensor's income tax liability. Licensee shall provide Licensor with such assistance as Licensor shall reasonably request in connection with any application by Licensor to qualify for the benefit of a reduced rate of withholding taxation under the terms of any applicable Income Tax Treaty.

4

VER000889

5.4     If any royalty amount paid by Licensee to Licensor under Section 5.1 hereof is subject to adjustment by any governmental tax authority, Licensee shall pay to Licensor, or Licensor shall pay to Licensee, as the case may be, the full amount of such adjustment.

## Section 6 - Confidential Information

6.1     Licensee hereby acknowledges that all of the Confidential Information disclosed or revealed to Licensee hereunder is disclosed solely to permit Licensee to exercise its rights and perform its obligations under this Agreement.  Licensee shall not use any of the Confidential Information for any other purpose, and shall not disclose or reveal any of the Confidential Information to any third party without the prior written authorization of Licensor, which Licensor may withhold in its sole discretion; *provided, however*, that the prior written authorization of Licensor shall not be required for Licensee to disclose the Confidential Information to those of Licensee's Affiliates, employees, suppliers and subcontractors that (a) require access to the Confidential Information in order to permit Licensee to exercise its rights and perform its obligations hereunder, and (b) have executed a nondisclosure agreement, in a form reasonably satisfactory to Licensor, which effectively prohibits the unauthorized use or disclosure of the Confidential Information.

6.2     Licensee shall implement all reasonable security measures, and shall take all reasonable actions, including, but not limited to, the initiation and prosecution of legal or administrative actions, to prevent the unauthorized use, appropriation or disclosure of any of Licensor's Confidential Information.

6.3     Licensee's obligations under Sections 6.1 and 6.2 hereof shall not apply to the extent, but only to the extent, that any of the Confidential Information:

> (a)     passes into the public domain through no fault of Licensee;
>
> (b)     was known to Licensee prior to disclosure hereunder by Licensor, or is independently developed by Licensee without reference to any of the Confidential Information;
>
> (c)     is disclosed to Licensee by a third party that is under no duty of nondisclosure to Licensor; or
>
> (d)     is required to be disclosed under any applicable law, regulation or governmental order of any country within the Territory; *provided, however*, that Licensee shall give prior written notice to Licensor of such legal disclosure requirement so that Licensor can take appropriate action to protect the confidentiality, and prevent the unauthorized use or appropriation of such Confidential Information.

6.4     Licensee's obligations under this Section 6 shall survive the termination of this Agreement for any reason whatsoever.

## Section 7 - Intellectual Property Rights

7.1     Licensee hereby acknowledges that Licensor is the owner, or authorized licensee, of all rights, title and interests in and to all of the Intellectual Property and Confidential Information licensed to Licensee hereunder (collectively, "Licensor's Property"), and Licensee shall acquire no rights whatsoever in or to any of Licensor's Property, except as specifically provided in this Agreement.  Licensee shall not utilize any of Licensor's Property for any purpose whatsoever, except as authorized herein, and shall not

VER000890

take any action which may, in the reasonable opinion of Licensor, adversely affect or impair Licensor's rights, title and interests in and to Licensor's Property.

7.2     Licensee shall take such actions, and shall provide Licensor with such assistance, as Licensor shall reasonably request, in order to protect and perfect Licensor's rights, title and interests in and to Licensor's Property throughout the Territory. All of the Products manufactured/produced, marketed, distributed and/or licensed by Licensee hereunder shall bear such proprietary rights notices as Licensor shall designate.

7.3     Subject to the limitation of liability set forth in Section 8 hereof, Licensor or its designee shall defend, indemnify and hold Licensee harmless against any and all claims, suits, actions, proceedings, losses, damages, liabilities, costs and expenses arising from, or attributable to, any allegation that Licensee's use of Licensor's Property in accordance with the terms and conditions of this Agreement infringes any copyright, trademark, trade secret, patent or other proprietary right of any third party existing in the Territory. Licensor's indemnity obligation, as set forth in this Section 7.4, shall be subject to the following conditions: (a) Licensee shall provide Licensor with timely written notice of any and all claims that are within the scope of Licensor's indemnity hereunder; (b) Licensor or its designee shall be solely responsible for the defense, settlement and discharge of any and all such claims; and (c) Licensee shall furnish Licensor with such assistance as Licensor shall reasonably request in connection with the defense, settlement and/or discharge of any and all such claims.

7.4     If the use of any of Licensor's Property is, or in Licensor's reasonable opinion is likely to be, prohibited by an order or injunction of a court of competent jurisdiction, Licensor shall provide written notice thereof to Licensee, and Licensee shall immediately cease all use of such of Licensor's Property.

Section 8 - Limitation of Liability

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NEITHER PARTY TO THIS AGREEMENT SHALL BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR INCIDENTAL DAMAGES ARISING FROM, OR ATTRIBUTABLE TO, THIS AGREEMENT AND/OR THAT PARTY'S PERFORMANCE HEREUNDER, WHETHER ARISING IN CONTRACT, TORT, BY OPERATION OF LAW, OR OTHERWISE, EVEN IF THAT PARTY HAS BEEN PLACED ON NOTICE OF THE POSSIBILITY OF SUCH DAMAGES.

Section 9 - Term and Termination

9.1     This Agreement shall enter into effect on the Effective Date hereof, and shall remain in full force and effect until terminated by mutual written agreement between the Parties, or in accordance with the provisions of this Section 9.

9.2     In the event that either Party (the "Breaching Party") shall commit any material breach or default of any of its obligations under this Agreement, the other Party (the "Non-Breaching Party") may give the Breaching Party written notice thereof and demand that such breach or default be cured immediately. If the Breaching Party fails to cure such breach or default within thirty (30) calendar days after the date of the Non-Breaching Party's written notice hereunder, the Non-Breaching Party may terminate this Agreement immediately upon giving written notice of termination hereof to the Breaching Party. Termination of this Agreement in accordance with this Section 9.2 shall not adversely affect or impair the Non-Breaching Party's right to pursue any legal remedy, including the right to recover damages for all harm suffered or incurred as a result of the Breaching Party's breach or default hereof.

6

VER000891

9.3     To the extent permitted under applicable law, Licensor may terminate this Agreement by written notice, to take effect immediately upon receipt thereof by Licensee, in the event that: (a) Licensee breaches any of its obligations, as reasonably determined by Licensor, under Section 6 (Confidential Information) or Section 7 (Intellectual Property Rights) of this Agreement; (b) Licensee goes into bankruptcy, voluntary or involuntary dissolution, is declared insolvent, makes an assignment for the benefit of creditors, or suffers the appointment of a receiver or trustee over all or substantially all of its assets or properties; or (c) any unrelated third party appropriates and/or acquires by law, regulation, order or any other involuntary means the intellectual property rights embodied in or related to any of Licensor's Property or the rights granted to Licensee hereunder, including, without limitation, through expropriation, or attempts or undertakes such action; *provided, however,* that Licensor may elect to terminate Licensee's right and license hereunder only with respect to the jurisdiction in which such involuntary appropriation or taking occurs.

9.4     This Agreement shall automatically terminate effective immediately before the enactment of any law, regulation or governmental order is enacted or issued, which, in the reasonable opinion of Licensor, jeopardizes or impairs the enforceability of any intellectual property rights in any of Licensor's Property in any country within the Territory, unless Licensee, upon written request from Licensor, agrees to refrain from utilizing Licensor's Property in such country.

9.5     Immediately upon termination of this Agreement for any reason whatsoever, Licensee shall cease all use of Licensor's Property, *provided that* Licensor may, at its sole option, permit Licensee to use such of Licensor's Property as Licensee reasonably requires to (a) sell/license or otherwise dispose of Licensee's existing inventory of the Products manufactured/produced by Licensee hereunder, and (b) provide service and support with respect to the Products licensed by Licensee to its customers within the Territory, in accordance with Section 4.4 hereof.

9.6     Subject to the provisions of Section 9.5 hereof, immediately after the date of termination hereof, Licensee shall return to Licensor all copies of all documents and other materials that contain or embody any of Licensor's Property that are in the possession of Licensee as of the date of termination. Any and all advertising and promotional materials that bear any of the Marks in the possession of Licensee as of the date of termination shall be promptly delivered to Licensor, or destroyed, except to the extent reasonably required by Licensee for use in connection with Licensee's disposition of its existing inventory of Products, and thereafter, Licensee shall not utilize any of the Marks for any purposes whatsoever.

9.7     Within thirty (30) calendar days after the date of termination of this Agreement, Licensee shall provide Licensor with the report provided for in Section 4.5 hereof for the quarter in which termination of this Agreement occurs, and shall concurrently tender all royalties payable by Licensee to Licensor hereunder with respect to that quarter and all other amounts payable by Licensee to Licensor hereunder which have accrued, but which remain unpaid as of the date of termination. Termination of this Agreement for any reason whatsoever shall not relieve Licensee of its obligations under Section 6 (Confidential Information), Section 7 (Intellectual Property Rights), or Section 11 (Compliance with Applicable Laws) of this Agreement.

VER000892

Section 10 - Assignment

Neither Party shall have the right or power to assign, delegate or otherwise transfer any of its rights or obligations arising under this Agreement without the prior written authorization of the other Party, and such assignment, delegation or other transfer shall then be effective only upon written agreement of the assignee, delegate or transferee to assume and be bound by the terms, conditions and limitations of this Agreement to the same extent it would have been bound had such assignee, delegate or transferee been an original Party to this Agreement; *provided, however,* that the prior written authorization of the other Party shall not be required for either Party to assign, delegate, subcontract or otherwise transfer any of its rights or obligations arising under this Agreement to any existing or newly formed Affiliate of either Party.

Section 11 - Compliance with Applicable Laws

11.1    In the exercise of their respective rights and the performance of their respective obligations under this Agreement, each Party shall comply with all applicable laws, regulations and governmental orders. Licensee shall, at its own expense, obtain and maintain in full force and effect throughout the continuance of this Agreement, all licenses, permits, authorizations, approvals and government filings and registrations ("Approvals") necessary or appropriate for the exercise of its rights and the performance of its obligations hereunder. Upon termination of this Agreement, Licensee shall transfer all such Approvals to Licensor, or to such other third party as Licensor may designate, to the extent permitted under applicable laws.

11.2    Without limiting the generality of Section 11.1, Licensee acknowledges and agrees that the Products, Intellectual Property and Confidential Information of Licensor are subject to export control by the United States Government. Licensee shall strictly comply with all requirements of United States laws and regulations related to such Products, Intellectual Property and Confidential Information, including, without limitation, U.S. Export Administration Regulations, 15 C.F.R. Parts 730-774, and all licenses and authorizations issued under such laws and regulations, and Licensee shall fully cooperate with Licensor in securing any export license and authorizations required thereby. Licensee agrees that it shall not, and shall cause its representatives, employees, agents, contractors and customers to agree not to, export, reexport, divert, release, transfer, or disclose any such Products, Intellectual Property, or Confidential Information, or any direct product thereof, to any prohibited or restricted destination, end-use or end user, except in accordance with all United States export control laws and regulations. Licensee shall make its records available to Licensor upon reasonable request to permit Licensor to confirm Licensee's compliance with its obligations as set forth in this Section 11.2. Licensee's obligations as set forth in this Section 11.2 shall survive expiration or termination of this Agreement for any reason whatsoever.

11.3    Each Party agrees that it shall comply fully with all applicable anti-corruption and anti-bribery laws, including, but not limited to, the United States Foreign Corrupt Practices Act. Without limiting the generality of the foregoing obligation, each Party agrees that it shall not make, authorize, offer or promise to make or give any money or any other thing of value, directly or indirectly, to any government official or employee, political party, or candidate for political office for the purpose of securing any improper or unfair advantage or obtaining or retaining business in connection with the activities contemplated hereunder. Any breach or violation of any provision contained in this Section 11.3 by either Party shall be grounds for immediate termination of this Agreement by the other Party.

8

VER000893

This Agreement, and any disputes arising out of or in connection with this Agreement, shall be governed by and construed in accordance with the laws of Texas, excluding its rules governing conflicts of laws.

Section 13 - General Provisions

13.1    Independent Contractors. In the exercise of their respective rights, and the performance of their respective obligations under this Agreement, the Parties are, and shall remain, independent contractors. Nothing in this Agreement shall be construed (a) to constitute the Parties as principal and agent, franchisor and franchisee, partners, joint venturers, co-owners or otherwise as participants in a joint undertaking, or (b) to authorize either Party to enter into any contract or other binding obligation on the part of the other Party, and neither Party shall represent to any third party that it is authorized to enter into any such contract or other obligation on behalf of the other Party.

13.2    Accounting Method. Costs, revenue, the timing for the recognition of revenue and any other financial measure in this Agreement shall be determined under U.S. Generally Accepted Accounting Principles.

13.3    Waivers. Either Party's failure to assert any of its rights hereunder, including but not limited to the right to terminate this Agreement due to a breach or default by the other Party, shall not be deemed to constitute a waiver by that Party of its right thereafter to enforce every provision of this Agreement in accordance with its terms.

13.4    Subject Headings. The subject headings of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.

13.5    Severability. In the event that any provision hereof is found invalid or unenforceable pursuant to a final judicial decree or decision, the remainder of this Agreement will remain valid and enforceable according to its terms. In the event of such partial invalidity, the Parties shall seek in good faith to agree on replacing any such legally invalid provision with a provision which, in effect, will most nearly and fairly approach the effect of the invalid provision.

13.6    Language of the Contract; Counterparts. Both Parties agree that English shall be the language of interpretation of this Agreement. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together constitute one and the same instrument.

13.7    Notices. All notices, reports, invoices and other communications between the Parties shall be in writing and sent by facsimile or email, by registered mail, postage prepaid and return receipt requested, or by overnight courier. All such communications shall be sent to a Party at the address shown at the beginning of this Agreement or to such other address of which the receiving Party has given prior notice to the sending Party. All such communications shall be effective upon receipt by the sender of confirmation of the delivery, or where no such confirmation is possible, when received.

13.8    Entire Agreement and Amendments. This Agreement, including the exhibits attached hereto, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements between the Parties, whether written or oral, relating to the same subject matter. No modification, amendments or supplements to this Agreement shall be effective for any

VER000894

purpose unless in writing and signed by each Party. Approvals or consents hereunder of a Party shall also be in writing.

      13.9   <u>Marking</u>. During the term of the Agreement, Licensee shall permanently mark all Products that would otherwise infringe a Licensor patent with a patent notice sufficient to comply with Title 35 of the United States Code Section 287 or its successor or, if the applicable patent is a non-U.S. patent, with a marking prescribed or permitted by the appropriate foreign issuing country.

*The remainder of this page intentionally left blank*

VER000895

The Parties have caused this Agreement to be executed by their duly authorized representatives effective as of the Effective Date.

Think3, Inc.

By: _____

Name: _Andrew S. Price_

Title: _VP Finance_

Date: _10/7/2010_

Versata FZ LLC

By: _R. Subramaniam_

Name: _Rahul Subramaniam_

Title: _Manager_

Date: _10/7/2010_

VER000896

## EXHIBIT 5.1

## Royalty Schedule

Pursuant to Section 5.1 of this Agreement, Licensee shall pay to Licensor the following royalties for the Products:

| Product | Total NPV | Payments | | |
|---|---|---|---|---|
| | | Oct 1, 2010 | Nov 1, 2010 | Dec 1, 2010 |
| Think3, Inc | $3,000,000 | $1,000,000 | $1,000,000 | $1,000,000 |

12

VER000897

**EXHIBIT F**
**to**
**Settlement Agreement**

<u>Asset Valuations</u>

1. Valuation and analysis of the IP licensed under the Original Versata License Agreement by FTI Consulting.

2. Valuation and analysis of the IP licensed under the Original Versata License Agreement by Antonio Bragaglia.

3. Assessment of the licensing of the IP licensed under the Original Versata License Agreement and attendant circumstances by Sherwood Partners, LLC.

4. Valuation and analysis of the IP licensed under the Original Versata License Agreement by Jerry Hausman.

**EXHIBIT G**
**to**
**Settlement Agreement**

<u>Licensee CAD Products</u>

"Licensee CAD Products" shall mean such computer-aided design products that were initially provided to Licensee by Licensor under this Technology License Agreement dated October 7, 2010, including without limitation the product known as "thinkDesign." For the avoidance of doubt, "Licensee CAD Products" shall not include Reserved PLM or TD PLM (as such terms are defined in the Settlement Agreement) or any of the products or suite of products known as "thinkPLM," "thinkteam," "thinkconfigure," "thinkchange,' "thinkproject," "thinkmaintain," "thinkprint," "ThinkDesign Viewer," or "Webteam." This <u>Exhibit G</u> shall be subject to further revision as may be agreed upon in writing by the Parties.

**EXHIBIT H**
**to**
**Settlement Agreement**

<u>Versata Software Products</u>

| Item Name | Description | Number of Releases by Think3 | Current Release Number |
|---|---|---|---|
| TDStyling | ThinkDesign Styling | 12 | 2010.2 |
| TDEngineering | ThinkDesign Engineering | 12 | 2010.2 |
| TDEngClassic | ThinkDesign Engineering Classic | 12 | 2010.2 |
| TDTooling | ThinkDesign Tooling | 12 | 2010.2 |
| TDProfessional | ThinkDesign Professional | 12 | 2010.2 |
| TDModifier | ThinkDesign Modifier | 10 | 2010.2 |
| TDOffice | ThinkDesign for Office Edition | 12 | 2010.2 |
| TDViewer | ThinkDesign Vie wer | 4 | 2010.2 |
| TDDrafting | ThinkDesign Drafting | 12 | 2010.2 |
| TDStylingup | ThinkDesign Styling Upgrade | 10 | 2010.2 |
| TDEngineeringup | ThinkDesign Engineering Upgrade | 10 | 2010.2 |
| TDEngClassup | ThinkDesign Engineering Classic Edition Upgrade | 10 | 2010.2 |
| TDToolingup | ThinkDesign Tooling Upgrade | 10 | 2010.2 |
| TDModifierup | ThinkDesign Modifier Upgrade | 10 | 2010.2 |
| MoldDesign | Mold Design | 3 | 2010.2 |
| DieDesign | Die Design | 5 | 2010.2 |
| Compensator | Compensator | 5 | 2010.2 |
| AMDAdaptation | AMD Adaptation on measured data | 5 | 2010.2 |
| CMDCompensation | CMD Compensation on measured data | 5 | 2010.2 |
| tcatiab | Catia v4 Translator | 10 | 2010.2 |
| tdirectproerw | thinkdirect Pro/E | 10 | 2010.2 |
| tdirectcatiarw | thinkdirect Catia v5 | 10 | 2010.2 |

| Item Name | Description | Number of Releases by Think3 | Current Release Number |
|---|---|---|---|
| tdirectparasolid rw | thinkdirect Parasolid | 10 | 2010.2 |
| CADENAScontent | PARTsolutions content | 10 | 2010.2 |
| CADENAS | PARTsolutions Professional | 10 | 2010.2 |
| CADENASfloat | PARTsolutions /Professional floating | 10 | 2010.2 |
| CADENASERPlite | ERPsolutions/db lite | 10 | 2010.2 |
| Reshape | Reshape | 3 | 2010.2 |
| TD PLM Office | TD PLM Engineering Office | 2 | 2009.2 |
| TD PLM Engineering | TD PLM Engineering Foundation | 2 | 2009.2 |
| TDPLMIntegrationTD | TD PLM thinkdesign® plug-in integration | 2 | 2009.2 |
| TDPLMIntegrationAC | TD PLM Autocad® Plug-in integration | 2 | 2009.2 |
| TDPLMIntegration IN | TD PLM Inventor® Plug-in integration | 2 | 2009.2 |
| TDPLMIntegrationSW | TD PLM SolidWorks® Plug-in integration | 2 | 2009.2 |
| TDPLMIntegrationPE | TD PLM ProE® Plug-in integration | 2 | 2009.2 |
| TDPLMIntegrationNX | TD PLM Siemens NX® Plug-in integration | 2 | 2009.2 |
| TD PLM Configurator Server | TD PLM Module for Configurator Server | 2 | 2009.2 |
| TD PLM Configurator User | TD PLM Module for Configurator User | 2 | 2009.2 |
| TD PLM Project Manager | TD PLM Module for Project Management | 2 | 2009.2 |
| TD PLM Change Management | TD PLM Module for Engineering change management | 2 | 2009.2 |
| tteamDocuments | thinkPLM Documents | 12 | 2009.3 |
| tteamPDM | thinkPLM | 12 | 2009.3 |
| tteamDevelopmentToo | thinkPLM developer | 12 | 2009.3 |
| tteamIntegrationxTD | ThinkDesign/GBG Integration | 12 | 2009.3 |
| tteamIntegrationxAC | Autocad/MD Integration | 12 | 2009.3 |
| tteamIntegrationxPE | Pro/E Integration | 12 | 2009.3 |
| tteamIntegrationxSW | SolidWorks Integration | 12 | 2009.3 |

| Item Name | Description | Number of Releases by Think3 | Current Release Number |
|---|---|---|---|
| tteamIntegrationxIN | Inventor Integration | 12 | 2009.3 |
| tteamIntegraxCATIA | Catia Integration | 12 | 2009.3 |
| tteamIntegrationxSE | Solid Edge Integration | 12 | 2009.3 |
| tteamIntegrationxUG | UG NX Integration | 12 | 2009.3 |
| tteamECR-ECO | thinkchange | 12 | 2009.3 |
| tteamIntegrationxMP | thinkproject for MS Project | 12 | 2009.3 |
| tpcm | thinkconfigure Manager | 12 | 2009.3 |
| tpcb | thinkconfigure Browser | 12 | 2009.3 |
| tteampcwizard | thinkconfigure Wizard Manager | 12 | 2009.3 |
| tprint | thinkprint Advanced Server | 12 | 2009.3 |
| tteamMaintain | thinkmaintain | 12 | 2009.3 |
| ReplicatedVault | replicated Vault Option | 12 | 2009.3 |
| wteam5 | webteam 5 | 12 | 2009.3 |
| wteam10 | webteam 10 | 12 | 2009.3 |
| wteam20 | webteam 20 | 12 | 2009.3 |
| wteam50 | webteam 50 | 12 | 2009.3 |
| ANSYS V12.1/11.1 Plug in | ANSYS V12.1/11.1 Plug in | 3 | 2010.2 |
| HQ Reverse Engineering | HQ Reverse Engineering | 2 | 2010.2 |
| *Total Releases* | | *559* | |

**EXHIBIT I**
**to**
**Settlement Agreement**

<u>Versata Trademarks</u>

(Please see attached.)

# Trademarks by Company - List

Think3 Inc.

| Trademark: | File Number: | Application: | Registration: | Jurisdiction: | Filing Basis: | Reg. Type: | Status: |
|---|---|---|---|---|---|---|---|
| THINK3 | | 75607855 | 2678446 | USA | Intent to Use | Principal Register | Registered |
| THINK3 | | 1001936 | TMA556869 | Canada | N/A | N/A | Registered |
| THINK3 | | 5467449 | | China (PRC) | | | Pending |
| THINK3 | | 5467448 | 5467448 | China (PRC) | | | Registered |
| THINK3 | | 1207893 | 1207893 | CTM | | | Registered |
| THINK3 | | 301071396 | 301071396 | Hong Kong | | | Registered |
| THINK3 | | 054160199 | 4630959 | Japan | | | Registered |
| THINK3 | | 5020109279 | 473867 | South Korea | | | Registered |
| THINK3 | | T9906157E | T9906157E | Singapore | | | Registered |
| THINK3 | | 88029595 | 00900935 | Taiwan | | | Registered |
| THINKDESIGN | | 75630860 | 2721653 | USA | Intent to Use | Principal Register | Registered |
| THINKDESIGN | | 6700107 | | China (PRC) | | | Pending |
| THINKDESIGN | | 1837715 | 1837715 | CTM | | | Registered |
| THINKDESIGN | | 301071404 | 301071404 | Hong Kong | | | Registered |
| THINKDESIGN | | 872202001 | 4607875 | Japan | | | Registered |
| THINKDESIGN | | 97011070 | 1348378 | Taiwan | | | Registered |
| THINKDESIGN | | 6700108 | 6700108 | China (PRC) | | | Registered |
| THINKPLM | | 301071413 | 301071413 | Hong Kong | | | Registered |
| THINKPLM | | 97011071 | 1348379 | Taiwan | | | Registered |
| THINKTEAM | | 75630597 | 2686882 | USA | Intent to Use | Principal Register | Registered |
| THINKTEAM | | 872212001 | 4635257 | Japan | | | Registered |

Total Trademarks For Think3 Inc.:   21

